## McCOMB *v.* FRINK.

## FRINK *v.* McCOMB.

APPEALS · FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF DELAWARE.

Nos. 215, 216. Argued April 25, 26, 1893.— Decided May 15, 1893.

M. subscribed to the capital stock of a company about to be formed a large sum on his own account, and $60,000 as trustee. · B., who was the *cestui que trust,* subsequently asked him to acknowledge that he held it in trust for S. who had purchased it of B. M. thereupon wrote under date of November 22, 1869, "To whom it may concern: I hereby acknowledge to hold in the Southern Railroad Association as trustee for S. under an arrangement with B. an original subscription of $60,000, on which 70 per cent has been paid. This motion is in conformity with an arrangement made some two months ago between B., S. and myself. (Signed) M." In 1875 S. commenced an action at law against M. in a state court of Massachusetts to recover on an alleged contract by M. to invest for S. the sum of $45,000 then in M.'s hands, in the stock of that association, and such proceedings were had that it was finally determined there that no such contract as charged existed, or if it existed, was broken. Subsequently facts were disclosed which showed a breach of trust by M., his administrator and administratrix filed this bill. *Held,*

(1) That the paper given by M. to S. in 1869 was an absolute and unqualified declaration of trust, for the amount of the subscription so far as it had been paid;

(2) That one essential to an estoppel by judgment is identity of cause of action, and that an examination of the pleadings and proceedings in the case in Massachusetts showed that the cause of action there was not identical with the cause of action here;

(3) That in view of the fact that M. when called as a witness in the action at law testified that the stock stood as it always had stood, and of the further fact that no breach of trust was discovered until just before the commencement of this suit, the plaintiffs had not been guilty of laches;

(4) That in view of the circumstances detailed in the opinion of the court the decree of the court below awarding a return of the amount for which M. acknowledged himself as trustee with interest reached, as nearly as possible, what justice demanded.

ON June 30, 1868, the Southern Railroad Association, an unincorporated association, was organized by certain parties

for the purpose of leasing and operating the Mississippi Cen-
tral Railroad, of which Henry S. McComb had previously
obtained a lease for himself and his associates. The capital
of this association was $1,500,000, of which Henry S. McComb
subscribed $415,000 personally, and also $60,000 as trustee;
Josiah Bardwell, $100,000; the balance being taken by ten
associates. On January 14, 1869, this association became
incorporated, under a special act of the legislature of Tennessee,
and to this corporation the voluntary association, on January
22, 1869, transferred its property. On January 21, 1869, such
action was taken by this incorporated company that the capital
stock named in its charter, to wit, $2,000,000, was issued to
the subscribers of the original unincorporated association in
proportion to the amounts of their subscriptions. In this way,
the subscription in the name of Henry S. McComb, trustee,
was enlarged from $60,000 to $80,000, and represented 800
shares of stock, for which eight certificates of one hundred
shares each, and numbered from 157 to 164, inclusive, were
formally issued by the incorporated company on October 6,
1870, to Henry S. McComb, trustee, and so remained on the
books of the company at the time of his death, December 30,
1881. It is undisputed that the subscription was taken origi-
nally by McComb as trustee for Josiah Bardwell. In the fall
of 1869 this correspondence took place between Bardwell and
McComb:

"My Dear McComb: Will you please acknowledge that
you hold in 'the Southern Ass'n,' as trustee for (the benefit)
or rather for C. B. Snyder, that am't of stock wh. you held
as for me, Mr. Snyder having two months since pd. me its
costs and interest.

             "Yours, truly,                    J. Bardwell.
     "Boston, Nov. 12, 1869."

                              "Office of H. S. McComb,
                    "Wilmington, Del., Nov. 22, 1869.
"Josiah Bardwell, Esq., care of F. Skinner & Co., Boston.

     "Dear Sir: I send this (acknowledgment as trustee) the
first leisure moment after the receipt of your letter, and if it

is not in conformity with your wishes in any manner please return it to me, with such instructions to be carried out as you shall be disposed to make.

   " Yours truly,                          H. S. McCOMB,
                                                    M."

The following is a copy of the paper enclosed in McComb's letter:

" To whom it may concern:

" I hereby acknowledge to hold in the Southern Railroad Association, as trustee for C. B. Snyder, under an arrangement with Josiah Bardwell, an original subscription of sixty thousand dollars, on which seventy per cent has been paid. This notice is in conformity with an arrangement made some two months ago between Josiah Bardwell, C. B. Snyder, and myself.

                          " H. S. McCOMB, *Trustee*."

On this acknowledgment is a memorandum in Bardwell's handwriting:

" Received Nov. 23, 1869."

At the time of his death, on July 18, 1882, Snyder was still the beneficiary under this trust, and on January 30, 1883, the plaintiffs, as administrator and administratrix, commenced this suit against defendant, as executrix, etc., of Henry S. McComb, the purpose of which was to establish the trust, and compel an accounting. The pleadings having been perfected, proofs were taken, and the case submitted for final hearing, which resulted in a decree on July 3, 1889, for the sum of $42,000 principal, and $49,420 as interest, making in the aggregate $91,420. 39 Fed. Rep. 292. Both parties appealed to this court.

*Mr. William G. Wilson,* for Frink and another, administrator and administratrix of Snyder, deceased.

*Mr. Wayne MacVeagh* and *Mr. George H. Bates,* (with whom was *Mr. Francis S. Bangs* on the brief,) for McComb, executrix.

I. No such trust was established in McComb in favor of the complainants' decedent as entitled the complainants to the relief prayed for in the bill, or to the relief granted in the decree.

II. The matters in controversy have already been passed upon by a court of competent jurisdiction in the suit brought by Bardwell against McComb in the Supreme Judicial Court of Massachusetts, which, begun in Boston in 1875, and terminated in 1878 in a verdict and judgment for the defendant, raised the same questions and was decided upon practically the same facts as belong in this controversy. The case is therefore *res judicata.* *Smith* v. *Whiting,* 11 Mass. 445.

The claim of a trust in McComb for Snyder was raised in the Boston case and settled there. The discovery of new evidence, even if pertinent, does not affect the former adjudication. *Kilheffer* v. *Hess,* 17 S. & R. 319; *S. C.* 17 Am. Dec. 658. And further, this new matter is wholly without value as strengthening the plaintiffs' equities. *Lawrence* v. *Vernon,* 3 Sumner, 22; *Steam Packet Co.* v. *Bradley,* 5 Cranch C. C. 393; *Block* v. *Commissioners,* 99 U. S. 686; *Packet Co.* v. *Sickles,* 5 Wall. 580; *Ballance* v. *Forsyth,* 24 How. 183; *Coit* v. *Tracy,* 8 Connecticut, 268; *S. C.* 22 Am. Dec. 110; *Phillips* v. *Berick,* 16 Johns. 136; *Betts* v. *Starr,* 5 Connecticut, 550; *S. C.* 13 Am. Dec. 94; *Cist* v. *Zeigler,* 16 S. & R. 282; *S. C.* 16 Am. Dec. 573; *Canaan* v. *Greenwoods Turnpike Co.,* 1 Connecticut, 1; *Price* v. *Dewey,* 6 Sawyer, 493; *S. C.* 11 Fed. Rep. 104.

III. The complainants are chargeable with laches. *Wagner* v. *Baird,* 7 How. 234; *Bowman* v. *Wathen,* 1 How. 189; *Hayward* v. *National Bank,* 96 U. S. 711; *Jenkins* v. *Pye,* 12 Pet. 240; *Brown* v. *Buena Vista County,* 95 U. S. 157; *Godden* v. *Kimmell,* 99 U. S. 201; *Richards* v. *Mackall,* 124 U. S. 183; *Preston* v. *Preston,* 95 U. S. 200; *Speidel* v. *Henrici,* 120 U. S 377; *Redfield* v. *Ystalifera Iron Co.,* 110 U. S. 174.

IV. McComb, even if a trustee for the complainants' decedent, committed no act, and neglected no duty to his *cestui que trust* in respect to the shares of stock in suit, such as makes

his estate liable for their original cost, with interest, or for any other sum of money. The Circuit Court, in holding that the amount of the recovery is to be governed by the alleged cost of the stock instead of by what it was worth, violated a thoroughly well established and reasonable principle. *Galigher* v. *Jones*, 129 U. S. 193 ; *Smith* v. *Bolles*. 132 U. S. 125.

*Mr. George Gray* closed for Frink and another, administrator and administratrix of Snyder, deceased.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

That some kind of a trust was created by this declaration of McComb appears on the face of the paper itself, and from its language, taken in connection with the correspondence which induced and accompanied it, it is also clear that it was an absolute, unqualified, unconditional trust which was declared by McComb. Whatever of doubt might from the mere language of the declaration arise as to whether this trust was limited or qualified by some arrangement with Josiah Bardwell, and whatever suggestiveness there might be in such language, of a foundation for the claim now put forward, that this subscription and stock was by arrangement with Bardwell held primarily as security for advances made or to be made by McComb to him, and for the benefit of Snyder, as *cestui que trust* only thereafter, and subject to this primary burden, is clearly displaced by the two letters which called for and accompanied the declaration. Bardwell's letter to McComb is a request that he acknowledge the holding to be in trust for Snyder, and because Snyder had paid therefor its cost and interest. That clearly is a request for an absolute and unqualified declaration of trust, and because the property had been fully paid for by Snyder to the original *cestui que trust.* That McComb intended and supposed by this declaration that he was giving the absolute declaration of trust requested is evident from the letter which he wrote accompanying it, for in that he says "if it is not in conformity with your wishes in any manner, please return it to me with such instructions

to be carried out as you shall be disposed to make." In other words, the transaction is this: Bardwell writes asking for an absolute declaration of trust in behalf of Snyder; McComb sends this declaration, accompanying it with a letter saying that if this does not comply with your wishes, send it back with such changes as you desire. Evidently the reference to an arrangement in the declaration was for the purpose of identifying the stock and subscription; and that there might not arise any pretence that any part of the subscription and stock standing in his own name was held in trust for Snyder. He simply meant to identify the trust property as that which all along had stood in his name as trustee, and to guard against the assertion of a trust in some other portion of the stock. If we go outside of the papers themselves, the testimony tends strongly to uphold the claim of plaintiffs that this was an absolute and unconditional trust. Bardwell did get from Snyder $45,000, as shown in this way: On April 22, 1869, Bardwell drew three drafts on Strang & Snyder, in favor of McComb, for $15,000 each. On the same day this receipt was given by McComb:

"Received, Boston, April 22, 1869, of J. Bardwell his three drafts of $15,000 each, 30, 40, and 50 days' date, on Strang & Snyder, New York, being in payment for one-fourth interest in 10,000-share transaction in the stock of the Chicago and Rock Island Railroad Co., to be managed by John F. Tracy, as agreed between myself and said Tracy, through Smith, Randolph & Co., of New York, as brokers, for the account of myself and Bardwell.

"H. S. McComb."

This was found among the papers of Mr. Snyder, with the following minute attached to it, signed by Mr. Snyder:

"The three drafts mentioned in the foregoing receipt were paid by Strang & Snyder, and by them charged to my account on their books after the transaction in Chicago and Rock Island Railroad Company's stock was closed. The whole or no part of the money or interest was returned to me, but

$42,000 was applied to the subscription to stock in the South-ern Railroad Association, for which amount I hold H. S. McComb's receipt, as trustee, dated November 23, 1869.

"Boston, January 23, 1870.       C. B. SNYDER."

McComb received and discounted these drafts, and sent the proceeds to Smith, Randolph & Co., which, by their letter of May 6, amounted to $44,709.38. On August 4, 1869, McComb gave Bardwell a draft on Smith, Randolph & Co. for $44,709, the exact amount of the deposit on May 6, the cents omitted; and on August 6 a check on the Bank of North America for $2500; and on the 15th of September wrote to Bardwell, stating, among other things, as follows:

"The net of your account is.....................$36,719 80
From which deduct payment of................ 2,500 00

    Leaving due you and subject to call..........$34,219 89
"Shall I pay your trustee call S. R. R. A. due the 20th inst.?
        "Ever yours,      H. S. McComb."

These transactions, including the letters, show that Snyder (or the firm of Strang & Snyder) advanced to Bardwell $45,000, and there is no testimony that it was ever repaid to Snyder, other than in this trust matter. The letter of September 15 also shows that McComb held money to the amount of $34,000 and over, subject to Bardwell's call. It appears also that Bardwell was very much embarrassed in October, and that this embarrassment was known to McComb.

The following is one letter that passed between them:

"(Personal.)          BOSTON, *Oct.* 5, 1869.
"MY DEAR FRIEND McCOMB: I am in trouble, and first to you I write. I left here Saturday night for New York, and returned Sunday; since Sunday I have not closed my eyes. I have been duped and swindled by that man Barry, and it is my own fault that makes the matter so much the worse. I had his honor pledged to me, and was credulous enough to

believe. Since Sept. 23 I have paid $260,000 for him. From a sick bed he came to see me in New York Sunday when my worst fears were realized, and he owned that he had lost $120,000 in stocks. After talking with him six hours I left, feeling disgusted and tired. I only fear now that I do not know the worst, he owes me $700,000 and I fear he has misapplied or used some $150,000 of acceptances, he said he had them on hand unused, but I have reason to think otherwise, when he told me that there were no more drafts on us, and that as it stood Friday, so it was and no more. I came home to find his drafts for $350,000 drawn on Saturday, these of mine have gone back. The sufferings of hell cannot compare but unfavorably with mine, but I won't write more.

" Yours always,      J. BARDWELL.

" Don't say a word about this to any one."

With knowledge of Bardwell's condition, as shown by this letter, as well as otherwise, McComb gave this declaration of trust. Can it be believed that it would have been issued in that form, and sent in a letter accompanied with an implied promise to put it in any other form that might be desired, if at the time the stock was held by McComb as security for advances made, and to be made, to a man so financially embarrassed?

Further, so far as appears from the testimony, McComb never suggested to Snyder, or, for that matter, to any one else, that this was other than an absolute and unqualified declaration of trust, until July 21, 1874, and then in this way. On June 3, 1874, Snyder wrote to McComb:

" I have unexpectedly been called on to pay $40,000, a debt of F. Skinner & Co. and myself, which I supposed was paid long since. Not owing anything, my means are all invested in a way that I cannot reach them at present. I can get along with $30,000. What I want is for you to let me have in some way the above amount, ($30,000,) so that I can use it at once, and then you can reimburse yourself from the sale of consolidated bonds when they are issued."

To which, on June 15, McComb replied as follows:

"I do not know how I can help you. I will do anything I can consistently with the obligations that are already on me, and hope to be able, at the meeting on Monday next, at New York, to suggest something that will relieve you, and not hurt me. You can depend upon my doing everything I can reasonably be expected to do in the matter."

On July 16, Snyder wrote again, and urgently, saying:

"I trust you will do me this favor, because I am really in a tight place and am borrowing the money from day to day, from my friends. I would not ask you for the favor if I could possibly get along without it. Will you help me? Please let me know when you will be in N. Y. or where I can see you next week."

In replying to this, on July 21, McComb said:

"I can send you the $30,000 Southern R. R. Ass'n paper, and will do it if you will return me the paper I signed, giving you so much of the benefits of the stock which was in my name as trustee for Mr. Bardwell, and which I held, by agreement from him, as collateral for advances made to him and F. Skinner & Co., which advances more than cover all this stock."

And this is the first intimation that the trust was not wholly for the benefit of Snyder. In addition, there is the testimony of Charles Marsh, that in the year 1873 he was in the office of the Southern Railroad Association, in the city of New York, at a day on which there was to be a meeting of the directors, and that while there McComb came in, and after saying good morning and passing the time of day, said: "Now, gentlemen, to-day I am prepared to offer you cost and interest of your stock. I had to guarantee Mr. Snyder that before he would take his at all; but this isn't anything you want to sell, this stock." And again, the testimony of Francis C. Cross that in June, 1874, he was present at a conversation between Snyder and McComb, which was substantially as follows:

"Mr. Snyder asked Mr. McComb to perform his agreement in regard to the Southern Railroad Association stock. Mr.

McComb replied to Mr. Snyder that he had better keep it and do as the other gentlemen were about to do, put in some more money; that it was a good thing and was worth two for one. Mr. Snyder told him that he wished the money, as he desired to foster other interests that were pressing him. · Mr. McComb said that he· had no money, but he would let him have some notes to the extent of $30,000, and Mr. Snyder replied that he would. If the notes were good he would use·them and would carry the balance for a time. No time was stated, however. Mr. McComb told Mr. Snyder to come down to a meeting that was to be held — as to the time of the meeting I have no recollection — if he would come there he would fix it up with him."

Further than that, on October 25, 1873, Edmund F. Cutter wrote to McComb:

"Are the interests of F. S. & C. in the Southern R. R'd Association, on which you advanced 60 M dollars, still intact, and are they worth the loan and principal? How does the 60 M of Mr. Snyder's stand affected?"

To which McComb replied as follows:


"WILMINGTON, DEL., *October* 27, 1873.

"E. F. Cutter, Esq., Boston, Mass.

"DEAR SIR: The South'n R. R. Association stands all right, and everybody's interest stands upright and square.

"Yours truly,          H. S. McCOMB, *Pres.*"


In June, 1875, Snyder began an action against McComb, in the city of New York. It was an action at law to recover $75,000 on account of the alleged conversion by McComb of this trust property to his own use. Mr. McComb's testimony was taken as follows:

"Q. What has become of the original subscription mentioned in this letter? A. It is still in my possession or under my control.

"Q. In what shape is it now? A. Stock of the company, as it was then.

"Q. In what name does it stand? A. H. S. McComb, trustee.

"Q. Has it stood so ever since this paper was written? Q. Continuously? A. Yes, sir.

"Q. I ask you how that subscription was paid? A. I pre sume it was paid by Mr. Bardwell to the company."

Subsequently the action was voluntarily dismissed by plain tiff.

Putting all these things together, there can be no reasonabl' doubt as to the nature of the transaction. There was an ab solute and unqualified declaration of trust given by McComt to Snyder for the amount of this subscription so far as it had been paid, and the Circuit Court did not err in so finding.

Again, it is insisted that the matters in dispute between the parties have been once determined by a court of competent jurisdiction, and the principle of *res judicata* is invoked as a defence to this action. It appears that, after the voluntary dismissal of the action in the New York court, Snyder, in October, 1875, commenced a like action at law in the Supreme Judicial Court of Massachusetts, which was tried without a jury, and resulted in a judgment in favor of the defendant, on December 23, 1878. The original declaration was in five counts. To this the defendant filed an answer denying "each and every allegation in each and every count of the plaintiff's declaration," and specifically denying any indebtedness; and, for a further defence, he demurred to the first four counts. Thereafter, by leave of the court, these first four counts were stricken out, and two substituted in their place. To this amended declaration the defendant filed an answer denying the allegations in the first two counts — the new portions of the declaration; and also, as a further defence, a demurrer to the third count — that being the fifth count in the original declaration. This amended declaration, in substance, alleged that the defendant, on July 16, 1869, had in his possession $45,000 belonging to the plaintiff; that in consideration of plaintiff permitting such sum to remain in his (defendant's) hand, he would purchase for plaintiff stock in the Southern Railroad Association; and, further, that he would, if re-

quested, take the said shares of stock from plaintiff and pay him $45,000, with interest; that, relying upon such promise and agreement, the plaintiff left the sum of $45,000 with defendant, but that he failed to purchase stock in the association; and that he, plaintiff, thereupon demanded payment of the sum of $45,000 and interest, which was refused. The second count was "for money had and received," the bill of particulars attached being as follows:

### "*Bill of Particulars.*

(1) To cash retained by you to be applied to purchase of stock in the Southern Railroad Association............................. $45,000 00

(2) To interest on same, July 15, 1869, to October 29, 1875............................. 16,978 50

$61,978 50 "

The third count, being the fifth in the original declaration, was an allegation of the conversion of six hundred shares of stock, and in these words:

"And the plaintiff further says that the defendant has converted to his own use six hundred shares of the capital stock of the Southern Railroad Association, a corporation duly established by the laws of the States of Mississippi and Tennessee, the property of the plaintiff."

The record of the proceedings in the Supreme Court of Massachusetts fails to show any ruling of the court on the demurrer to this third count, and one of the counsel for the plaintiff in that action testified that by mutual consent this third count was abandoned, testimony which seems to be supported by an extract from the brief of the defendant's counsel, in which it is stated "the count in tort has been abandoned." On the trial of that case the plaintiff made application to amend his declaration into a bill in equity, a bill founded upon this trust, but such application was denied by the court, such denial being, within the statutes of Massachusetts as well as the general practice, a matter of discretion.

So that the case, as finally determined, was simply one at law for breach of a contract to invest in the stock of the Southern Railroad Association.

This mere recital of the facts concerning that action at law seems sufficient answer to the plea of *res judicata,* for among the essentials of an estoppel by judgment is identity of the cause of action. *Atchison, Topeka &c. Railroad* v. *Jefferson County,* 12 Kansas, 127; 2 Bouv. Law Dic. title "Res Judicata." When an action at law for breach of a contract to invest in stocks fails because the testimony develops that the investment was made and a declaration of trust given in respect to the stock so purchased, it would seem strange to hold that such judgment is a bar to a suit in equity for a breach of the trust, especially when it appears from the records in the law case that an application to change the declaration into a bill in equity in respect to the trust was denied. As was said in *Cromwell* v. *County of Sac,* 94 U. S. 351, 353: "In all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and determined in the original action, not what might have been litigated and determined. Only upon such matters is the judgment conclusive in another action." What might have been determined in the Massachusetts court if the amendment of the declaration had been permitted can only be conjectured; what was determined was that no such contract as charged existed, or, if it existed, was broken. Copious extracts were in evidence in this case from the brief of the defendant's counsel in the Massachusetts case, which show that the defence relied upon was that no action at law could be maintained in consequence of the disclosure of the trust receipt. It is enough to quote these, which are but samples of others:

"It is, of course, unnecessary to give any consideration to the 'trust receipt,' except as it disproves the agreement alleged, because —

"(1.) It is not the contract alleged and declared on and for breach of which money is sought.

" (2.) Because its only scope and effect is to create a trust, for the enforcement of which no action of law can be brought, but only a remedy sought in equity."

\*　　　\*　　　\*　　　\*　　　\*

" It becomes wholly unnecessary, as it is entirely impracticable, to inquire, consider, or determine what anybody's rights may be under the trust created or declared on in this transaction

" When, if ever, a bill in equity shall be brought, and all parties in interest brought into court, that may be an interesting as it will be a necessary question. Till then it is enough that the trust created and acted upon for more than six years by all parties clearly negatives any other agreement concerning this original subscription, and necessitates a judgment for the defendant in this suit."

Properly, therefore, the Circuit Court held against this claim of *res judicata.*

It is suggested that the plaintiffs have been guilty of laches; but in view of the fact that defendant, when called as a witness in the first law action, testified that the stock stood as it always had stood, and of the further fact that no breach of the trust was discovered until just before the commencement of this suit, this defence is also without merit.

The final question is as to the measure of damages. The court charged the defendant with the amount invested by plaintiff, and recognized by the declaration of trust, to wit, $42,000, and interest. Both parties challenge the question of correctness of this amount. The plaintiffs insist that McComb sold his own stock for $125 a share, and that, therefore, in the accounting he should be charged for the 800 shares held by him in trust for Snyder at that price per share, for which sum, together with interest to date, a decree should be passed. The defendant claims that McComb never did anything with this trust stock, other than in the fair discharge of his duties as trustee; that, owing to causes over which he had no control, and for which he was not responsible, the stock finally ceased to be of any value, and, therefore, that his estate should not be called upon to account for anything. It becomes necessary

to see exactly what McComb did with this stock. The Southern Railroad Association was the lessee of the Mississippi Central Railroad Company, and was incorporated for the purpose of taking a lease of and operating said road. This road extended from Jackson, Tennessee, to Canton, Mississippi; there it connected with the New Orleans, Jackson and Great Northern railroad, running from that place to New Orleans, Louisiana. McComb was a large holder of stock in that company. On November 8, 1871, he made an arrangement by which he sold to the Pennsylvania Company 14,000 shares in the New Orleans, Jackson and Great Northern Railroad Company, at $50 per share, and 5000 shares in the Southern Railroad Association at $125 a share. At the same time he transferred to the Pennsylvania Company an additional 14,000 shares in the New Orleans, Jackson and Great Northern railroad, and 5000 shares in the Southern Railroad Association. Included in this last 5000 shares was the 800 shares standing in the name of McComb as trustee, which were transferred by an endorsement on the certificates, vesting apparently an absolute title in the Pennsylvania Company.

The stock which he sold was his own, and the whole cash payment, $1,325,000, passed to him, and, so far as appears, was appropriated to his own uses. By means of this transfer the Pennsylvania Company obtained control of the Southern Railroad Association, as well as of the New Orleans, Jackson and Great Northern Railroad Company. The transaction between McComb and the Pennsylvania Company is evidenced by three documents, executed on November 8, 1871, but though evidenced by these separate instruments, there was manifestly but a single transaction by which McComb transferred to the Pennsylvania Company the control of these two corporations, accomplishing this vesting of control by the sale of his own stock, at a large price, and a transfer of this trustee and other stock, without receiving a dollar. Obviously it was the use of this latter stock that enabled him to sell his own. If this were all, the obligation to account would unquestionably reach to $125 per share; but the purchase of McComb's stock was subject to an obligation to repurchase at the end of

two years, at the same price and thirty per cent advance, less dividends received by the company. . This condition may well be deemed to have entered largely into the fixing of the price,. and prevents that price from being a fair test of the value.. Neither should one or two extravagant statements made by McComb, apparently to quiet any fears on the part of Snyder as to his investment and to continue his confidence therein,. be considered sufficient to justify placing any such valuation on the stock. On the other hand, it is quite clear that the stock was worth at least what it had cost at the time of the trust declaration. Indeed, we do not think this is seriously questioned by the defendant. Little need be said with respect to the contention of defendant, that McComb did no more with this stock than a trustee might rightfully do, and that he used it simply to induce the Pennsylvania Company to take hold of this association, and manage it for the best interests of all the stockholders. On the contrary, it is more correct to say that he used this stock to induce the Pennsylvania Company to buy his own, or at least to increase the price at which it bought. Evidently the Pennsylvania Company wanted the control, and for that end a majority of the shares. It might not have been willing to pay $125 a share if it had been compelled to buy the 10,000 shares; but would naturally. be willing to pay a larger price for half if the other half could be placed in its hands without cost, and thus the control obtained.. Very likely the *cestui que trust* would have preferred $125 in cash to the promise of even the Pennsylvania Company to manage the interests of the association for the benefit of all stockholders.

We think, taking all the circumstances into consideration,. that the Circuit Court reached as nearly as possible what justice demands when it awarded a return of the amount for which McComb acknowledged himself a trustee and interest.. The decree will, therefore, be

*Affirmed. The costs of this court will be equally divided between the parties.*