CORRIGAN et al. v. IROQUOIS FURNACE CO.

(Circuit Court of Appeals, Seventh Circuit. March 22, 1900.)

No. 604.

SHIPPING—CONSTRUCTION OF CARRYING CONTRACT—DEMURRAGE.

Libelants contracted to carry, in their own or substituted vessels from Escanaba to South Chicago, the ore required by respondent for its iron furnaces during the season, not to be less than 90,000 tons, and to be divided as evenly as possible during the season of navigation. Respondent contracted to do the unloading at its dock, and for dispatch therein, but the contract contained no provision for dispatch at the port of shipment; it being understood that respondent was obliged to procure the ore there from other parties. It subsequently contracted with two companies, operating mines connected by rail with Escanaba, to supply the ore at that port, and notified libelants to ascertain from them when cargoes were ready for shipment. Held, that there was no implied term of such contract requiring respondent to supply cargoes for loading at any particular time, or which rendered it liable for demurrage, because of the delay of libelant's vessels while waiting for cargoes.

Appeal from the District Court of the United States for the Northern District of Illinois, in Admiralty.

This is a libel in personam filed by the appellants, John Corrigan, Robert McDowell, and X. C. Scott, the owners of the steamer Aurora and the schooners George W. Adams and J. I. Case, in a cause of demurrage, or for damages in the nature of demurrage, for the detention of those vessels, arising from the alleged default of the Iroquois Furnace Company, the respondent below. The libel propounds that on the 9th day of March, 1893, John Corrigan, one of the libelants, as managing owner and in behalf of all of the libelants, entered into a contract, civil and maritime, with the respondents, as follows: "This agreement, entered into at Cleveland, Ohio, this 9th day of March, 1893, by and between John Corrigan, of Cleveland, Ohio, managing owner of a fleet of vessels, party of the first part, and the Iroquois Furnace Company, of Chicago, Ill., party of the second part, witnesseth: That the party of the first part agrees to carry in his boats, or such boats as he may substitute therefor, a quantity of iron ore, from ninety thousand (90,000) to one hundred and twenty thousand (120,000) gross tons (being the amount which said second party shall use in their furnace during the season of 1893, but not to be less than 90,000 gross tons), from the port of Escanaba, Michigan, to the docks of the said second party in the port of South Chicago, Illinois; this quantity to be divided as evenly during the six months of navigation, commencing May 1st and ending November 1st, 1893. The party of the second part agrees to furnish the said quantity of iron ore, from 90,000 to 120,000 tons, for shipment at Escanaba, Mich., and to pay the party of the first part the sum of 44 cents per gross ton freight, payments to be made on the 20th of each month for freight on all ore carried during the first fifteen days of such month, and on the fifth day of each month for freight on all ore carried between the 15th and the last day of the month preceding, which rate of freight the party of the first part agrees to accept under the following conditions, which are hereby agreed to by the said party of the second part, viz.: That the party of the second part shall furnish and operate at their dock in South Chicago for unloading the vessels carrying cargoes under this contract four (4) Brown Hoists, and furnish a sufficient gang of competent men to unload such vessels, giving them as good dispatch in unloading as is given by similar unloading plants at other receiving ports on the lakes, and that all the expense of unloading shall be borne by the said party of the second part, making the cost of unloading free to the vessel. It is further agreed that the party of the second part shall use their influence with the agent of the ore docks at Escanaba to have the ore kept as near together in pockets at Escanaba as possible; also that they will, if possible, make ar-

rangements with the unloading gangs to commence unloading the steamer Aurora at once whenever she shall arrive at South Chicago, and to continue work until she is unloaded. It is understood that the consorts of the steamer Aurora shall be unloaded after the steamer has been finished, and before she shall return from Escanaba with another cargo of ore. It is further understood and agreed that the vessels employed under this contract shall be at liberty to engage in other trade at any time that the party of the first part may desire to so use them: provided, that they keep the party of the second part supplied with ore in sufficient quantity to keep their furnace in operation, and in such case the party of the first part agrees to stand any reasonable delay in getting the unloading gang together again that may occur on account of the men not having steady employment." The libel charges that the respondent "was bound to provide and have ready cargoes of ore for the said vessels on their arrival at Escanaba each trip in the performance of said contract, and was entitled to a reasonable time, and no more, for loading the same, and that a reasonable time for loading, when the cargoes were duly provided, was twelve working hours or less"; and that, by reason of the manner of performing trips as provided in the contract and pursued by the parties, the delay of either vessel in loading delayed performance under the contract of all three of the vessels. It appeared by the evidence that 46,000 gross tons were carried during the season of 1893, and by agreement of parties the completion of the contract was carried over to the season of 1894.

The detentions declared by the libel as amended are as follows:

| | | | | | |
|---|---|---|---|---|---|
| 1893. | July | 18. | Sch. George W. Adams and steamer Aurora | 1 day, | 2 hours. |
| | " | 24. | Sch. J. I. Case and steamer Aurora | 4 days, | 8 hours. |
| | Aug. | 3. | Sch. George W. Adams and steamer Aurora | 2 days, | 4 hours. |
| 1894. | July | 12. | Steamer Aurora and consort | 5 days. | |
| | " | 23. | Sch. J. I. Case and steamer Aurora | 1 day, | 11 hours. |
| | Aug. | 17. | Sch. George W. Adams | 8 days, | 7 hours. |
| | " | 23. | Sch. J. I. Case and steamer Aurora | 5 days, | 3 hours. |
| | " | 5. | Steamer Aurora and consort | 2 days. | |

30 days, 11 hours.

The answer, admitting the execution of the contract, took issue with the allegation of the libel touching the duty of the respondent founded upon the libelants' construction of the contract, denied misconduct on its part, and that any detention of the libelants' vessels was owing to the fault of or properly chargeable upon the respondent. The further facts of the case, so far as they were deemed necessary to be considered, are stated in the opinion of the court. The district court at the hearing dismissed the libel.

Charles E. Kremer, for appellants.

William Brace, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

JENKINS, Circuit Judge (after stating the facts as above). In the case of a charter party there is undoubtedly an implied term of the contract, in the absence of any specific provision therein, that a vessel shall have reasonable dispatch in loading and unloading. That reasonable time is determined by the circumstances surrounding each case (Empire Transp. Co. v. Philadelphia & Reading Coal & Iron Co., 40 U. S. App. 157, 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623); and it may be said a vessel should ordinarily have prompt dispatch, for such is essential to her profitable employment. But in the case at bar we have not to deal with a simple charter party. It was a contract for the transportation of ore during the season of

navigation. It was competent for the libelants to make such contract as they chose, and the liability of the respondent must be sought in that contract. The respondent was absolutely bound to furnish for transportation 90,000 gross tons of ore during the season of 1893. It was contemplated that this quantity should be furnished as nearly as practicable in equal amounts monthly during the six months of navigation. To the knowledge of the libelants, the respondent had not at the time of the agreement contracted for the purchase of the ore. It subsequently did so contract with Oglebay, Norton & Co. and Corrigan, Ives & Co., two firms located at Cleveland, and operating mines which were connected with Escanaba by the railway of the Chicago & Northwestern Railway Company; of which fact Corrigan was notified as early as June 13th, up to which time no vessel had been sent for ore. The libelants were not obliged to furnish any particular vessels, but had the right to substitute for those they owned any other vessels. They could not insist that the ore should be ready for shipment at any time they might specify, or at a time when it might be convenient for them to send their vessels for it. Their right under the contract was simply that the specified quantity should be furnished during the season, and that they should have approximately 15,000 tons a month for transportation. They were not obliged to take the ore immediately upon its arrival at Escanaba. They could suit their own convenience with reference to sending their vessels for it, subject only to the condition that they furnish the respondent sufficient ore to keep its furnace in operation. The respondent by no express term of the contract undertook to be responsible for prompt or reasonable dispatch of the vessels at the port of shipment. It did undertake for such dispatch at the port of delivery, and no complaint is made of detention there. The reason for this distinction is palpable. In the one case the respondent must rely for a supply of ore upon the operation of the mines, and its transportation by rail, over neither of which it had or could exercise control. In the other case the matter was under its control. It is reasonable that it should not bind itself to prompt dispatch in the one case, but should so bind itself in the other. That it did so expressly bind itself with respect to the port of delivery, and did not so bind itself with respect to the port of shipment, is strong to show that the parties understood that it was not to be bound in the latter case, except as the detention should arise from the acts and misconduct of the respondent. "Expressio unius est exclusio alterius."

On the 13th day of June, 1893, the respondent, in answer to a letter from Corrigan of the 12th, asking when ore would be ready for shipment, wrote expressing surprise at the inquiry, as he understood that he should deal with Barr, the agent of the Northwestern Railway Company at Escanaba, to ascertain when ore was ready for shipment. It further appeared from the evidence that the respondent had informed Corrigan of the contract with the two Cleveland firms, who had offices either in the same building or adjacent, and requested him to learn from them when ore was shipped from the mines. That he corresponded with Barr is proven, but the corre-

spondence is not disclosed. The only ground, to our thinking, upon which the respondent could be held for the detention of the vessels, is that it notified Corrigan that ore would be ready, in consequence of which Corrigan sent his vessels for it, and that they were detained because of failure of cargo; or that, being notified by Corrigan that he would send his vessels for cargo at a specified time, the respondent, with knowledge that there would be no cargo for the vessels, failed to notify Corrigan, and so by its fault caused a detention of the vessels. We search the record in vain for evidence indicating any such act or failure on the part of the respondent. The libel charges none, but proceeds upon the assumption that under the contract the respondent was bound to have a supply of ore ready for shipment whenever the vessel should call for it. This is an erroneous construction of the contract, and that error lies at the foundation of the libelants' case. There is no assertion that 15,000 gross tons of ore were not furnished monthly for shipment while the vessels were engaged in carrying. The respondent failed in its contract to deliver for shipment 90,000 gross tons during the season of 1893. The libel does not proceed for such failure, and the parties by agreement extended the time for the performance of the contract in that respect, carrying it forward to the season of 1894, when performance was completed. Under the contract, the vessels were not chartered to the respondent. The libelants could use such vessels as they pleased. They could employ in this work the three vessels named, or could substitute others. The situation is clear upon the face of the contract. The ore was to be mined and transported by rail to Escanaba for delivery to the vessels. Time was an uncertain element of the situation, but it was believed that both parties could rely upon receiving 15,000 gross tons per month. At what time in the month that quantity would be ready was uncertain. The capacity of the steamer and her two consorts was from 5,700 to 6,200 tons. To economically do this carrying, it was essential that there should be at Escanaba an accumulation of iron ore sufficient to enable the vessels to make at least two or three consecutive trips from Escanaba to South Chicago. It was manifestly the purpose of the parties that in some way Corrigan should ascertain or be informed when ore was ready for shipment at Escanaba, and should not send the vessels there without such knowledge. We think it proven here that he was to obtain such information either from Barr, the agent of the railway company at Escanaba, or from the agents of the mines at Cleveland, who had contracted with the respondent to deliver the iron ore. If, without such information and upon the assumption that the respondent was bound to have ore for delivery whenever the vessels should be ready to receive it, Corrigan sent vessels for the ore, and they were detained in consequence, the respondent cannot be charged therefor. It would serve no useful purpose to go through the evidence in this case in detail. It has received careful attention, and we perceive no ground upon which liability can justly be laid upon the respondent for the detention asserted.

It may further be observed that this claim would seem to be in large measure an afterthought, growing out of failure to contract with the respondent for its carrying trade in the season of 1895. No protest with respect to the claimed detention was lodged with any one, nor extended upon the bill of lading signed by the captain of the vessel. Nor was any definite claim with respect thereto preferred until the year 1895, although there had been prompt payments and receipts in full for the freight. The decree is affirmed.