### DONNELL et al. v. AMOSKEAG MFG. CO.

### AMOSKEAG MFG. CO. v. DONNELL et al.

#### (Circuit Court of Appeals, First Circuit. September 4, 1902.)

#### Nos. 412, 413.

**1. SHIPPING—CONSTRUCTION OF CHARTER—DEMURRAGE.**

    The erasure, before execution, from a printed form of a charter party, of the clauses fixing the number of lay days and the rate per day for demurrage, or the failure to fill the blanks therein, leaves the rights of the parties with respect to demurrage or damages for detention to be determined by the general rule as to reasonable dispatch.

**2. SAME—TIME FOR LOADING—USAGE OF PORT.**

    In determining what constitutes reasonable dispatch, the usages of the ports must be taken into consideration, both parties being presumed to have knowledge of such usages, whether having actual knowledge or not; and where a charter provided that the vessel should report to a certain coal company in Baltimore, and "be loaded by them in turn," the agreed place of loading was, by implication, the docks or piers of such company, and the time required for loading, where not specified in the charter, must ordinarily be determined with reference to its usual facilities.

**3. SAME—VESSEL TO BE LOADED "IN TURN."**

    A provision of a charter that the vessel should be loaded by a coal company "in turn" must be strictly construed, and it shuts out a practice of the company to give preference to its own vessels, or to sell coal to local customers from the supply which would otherwise have been available for loading at its docks, to the delay of the chartered vessel.

**4. COSTS ON APPEAL.**

    Both parties having appealed, the rule as to costs in The North Star, 1 Sup. Ct. 41, 106 U. S. 17, 29, 27 L. Ed. 91, is applied in preference to that in McComb v. Frink, 13 Sup. Ct. 993, 149 U. S. 629, 644, 37 L. Ed. 876.

Appeal from the District Court of the United States for the District of New Hampshire.

Benjamin Thompson, for Donnell and others.

Edward W. Hutchins and Henry Wheeler, for Amoskeag Mfg. Co.

Before COLT and PUTNAM, Circuit Judges.

PUTNAM, Circuit Judge. These appeals arose out of a libel in behalf of the schooner Alice M. Colburn against a cargo of coal at the

¶ 1. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

port of discharge for the purpose of collecting damages for improper detention of the vessel at the port of loading. The charter names no lay days, and therefore no stipulated amount for detention; so that, strictly speaking, there could be no demurrage. The vessel urges the obligation which the law imposes on a charterer to pay reasonable damages for an unauthorized or unreasonable detention at the port of loading or discharge. There is, of course, no lien imposed by the law on a cargo for demurrage, or improper or unreasonable detention, at the former port. In this case, therefore, the vessel necessarily relies on the following clause in the charter: "Vessels to have lien on cargo for freight and demurrage." Inasmuch as, in popular use, demurrage covers not only what is strictly known to the law as such, but also damages for detention when such damages are recoverable, and as this instrument is a mercantile one, it is reasonable that we should hold that this clause gives the vessel a lien for the damages claimed, if she is entitled to them; and no proposition has been made to the contrary by either party.

The first question arises from the fact that the printed form on which the charter party was executed originally contained the following: "It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the captain reports himself ready to receive or discharge cargo." These were stricken out before the charter party was executed. It also contained the following: "And that for each and every day's detention by default of said party of the second part, or agent, ——— dollars per day shall be paid by said party of the second part, or agent, to said party of the first part, or agent." As printed, a blank was left before the word "dollars." This was never filled.

Also the charter party, although it was executed between Mr. William T. Donnell, representing the vessel, and the Garfield & Proctor Coal Company as charterer, contained the following, not in the original printed blank, but written in: "Vessel to report to the Consolidation Coal Co., Baltimore, for orders, it being understood vessel shall be loaded by them in turn."

The claimant of the cargo maintains that when the charter party was executed the parties thereto anticipated unusual delay in loading; that thereupon the Garfield & Proctor Coal Company refused to hire the vessel with any liability for demurrage at Baltimore, and that finally a bargain was struck, whereby an enhanced rate of freight was agreed on, with the understanding that there should be no liability for detention resulting from the inability of the charterer to load. It offered some parol evidence to sustain these propositions, but, on fundamental rules, there is nothing which justifies us in giving any weight to that class of proofs. By consigning the vessel to the Consolidation Coal Company, the Garfield & Proctor Coal Company, in whose shoes the claimant stands, made itself responsible for the acts or omissions of the consignee, and in that respect it stands the same as though the stipulation had been that the vessel should report to itself, subject to whatever limitations arise from the fact that the charter party provided that the vessel should be loaded by the Consolidation Coal Company in turn. So that the customary facilities

which the Consolidation Coal Company had at Baltimore for furnishing coal and loading it must be included among the elements which are to be considered in determining whether the vessel was loaded with reasonable dispatch. Nevertheless, the Garfield & Proctor Coal Company, which the claimant succeeds, is not excused in the event reasonable dispatch was not used, having in view all the circumstances which properly may be considered in that connection, including such weight as should be given to the customary facilities which the Consolidation Coal Company possessed. In other words, the erasure of the clause which was erased, and the omission to fill the blank before the word "dollars," have no effect on the construction or application of the charter party other than would have resulted if the blank, as originally printed, contained none of the clauses which were thus nullified.

It is a settled rule of law that, where there is no stipulation as to demurrage, or damages for detention, a vessel must be loaded or discharged with reasonable dispatch according to the customs of the agreed place of loading, its physical conditions, and the peculiar contingencies of the weather, and some other contingencies which are occasionally taken into account. This rule has been stated such an infinite number of times that it is not necessary to enlarge on the authorities where it can be found; but it is well expressed in Scrutton, Charter Parties (4th Ed.) 74, 244. We cite only from page 244, as follows:

"If no fixed time for loading or unloading is stipulated in the charter, the law implies an agreement on the part of the charterer to load or discharge the cargo within a reasonable time, and, so far as there is a joint duty in loading or unloading, that the merchant and shipowner should each use reasonable diligence in performing his part."

This rule has been so often reiterated, and is so essential for working out practical results, that it must be accepted as applicable to any charter party where there is no express provision for lay days, unless there are explicit terms which require otherwise. It is so thoroughly settled that it has almost the force of a statute; and certainly it cannot be rejected by reason of any feeble presumption or hypothesis arising from the mere annulling of the paragraphs which were annulled in the instrument at bar. Therefore we start with the general proposition that this charter party was subject to the usual obligation of reasonable diligence in the matter of loading, and that on that point the charterer must stand for the acts and omissions of the Consolidation Coal Company, to which it consigned the vessel, subject to the qualification which we have already suggested.

As for all charter parties, certain usages at the place of loading must be taken account of. This is independent of any questions whether the usages are known, or whether a party is chargeable with knowledge of them, because it has no connection with those classes of usages which control the construction of contracts or the relations of the parties to each other. Chit. Cont. (11th Am. Ed.) 116, note "u"; 2 Pars. Cont. (8th Ed.) *537, *544, *545; 3 Pars. Cont. (8th Ed.) *239, *240; Poll. Pr. Cont. (7th Ed.) 253 et seq.; Robinson v. Mollett L. R. 7 H. L. 802, 838. The topic of the usages of a port with reference

to the mere matter of loading and unloading vessels relates to the application of the charter party or the bill of lading, and not to its construction. It concerns and regulates practical dealings in such manner that, aside from it, infinite confusion would prevail. Such usages fall into the same class as those which relate to the places of anchorage in ports, or the methods of navigating them, to the determination whether, in traveling the highways on a continuous journey between different states or adjoining countries, the right hand or the left hand side of the road should be taken, and to the fact that, although any agreement of transit ordinarily names only the termini of a voyage, the voyage, nevertheless, is the usual voyage, so that nothing which conforms to the usual voyage can be held a deviation. Phil. Ins. §§ 980, 981. The distinction was clearly made in the opinion of Lord Blackburn in Postlethwaite v. Freeland, 5 App. Cas. 599, 616. Indeed, with reference to such usages the rule is too well settled that any shipowner sending his vessel to a foreign port must abide by them, whether he knows them or not, or is to be charged with knowing them, to need any citation of authorities; but it is sufficiently stated in Scrutton, Charter Parties (4th Ed.) 20, as follows:

"The fact that a person who has contracted to load at a certain port is ignorant of how loading is conducted at that port cannot save him from being bound by the ordinary method of loading there."

The author, on the same page, makes the distinction in this respect which we have already stated with reference to customs of a general character. He also states the rule succinctly at page 106, and it is also found in Hudson v. Ede L. R. 3 Q. B. 412, 415, a case elsewhere referred to by us.

We have, then, as the result of this investigation, a charter party by which the vessel in question was to be loaded by the Consolidation Coal Company "in turn," subject to the fact implied by the law that, in the absence of any fixed number of lay days, the vessel was to be loaded with reasonable diligence according to certain usages of the place of loading. Having ascertained these propositions, the general rules of construction of the charter party are sufficiently expressed in Cargo of 1,755 tons of Cumberland Coal, in which the opinion was passed down by us on March 4, 1902, found, under the title of Evans v. Blair (C. C. A.) 114 Fed. 616, 623. These rules have been settled for a long period of time as applicable to charter parties, and are stated by us at page 619; one of them being a rule of close technical construction, and the other one broad and liberal. The first is that "where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent." This has nothing to do with the other underlying principles that in commercial instruments trade expressions are to be interpreted as understood by merchants, and that, where the real intent can clearly be gathered from the entire instrument, it should be upheld. Carv. Carr. at Sea (3d Ed.) § 163 et seq.; Abb. Shipp. (5th Ed.) 188; Scrutton, Charter Parties (4th Ed.) 11 et seq. The other rule is:

"When the law itself attaches to a contract conditions beyond those expressed by the parties, and attaches them because some conditions beyond those expressed are essential to practically work out what the parties have undertaken to accomplish, the conditions thus attached will be just and reasonable."

We will find, therefore, that, so far as the expression "in turn" is concerned, we must follow a strict construction; but as to any question of usage at the place of loading we must apply just and reasonable rules.

The parties have proceeded very much on the hypothesis that, so far as local usages are concerned, they are governed by those general to the port of Baltimore. Applying a reasonable and just rule, we will find this is true only in a limited sense, because we will find that, although the charter party did not in terms specify any particular place in that port at which the vessel was to be loaded, yet the notorious facts are such that, in view of the stipulation that the vessel should report to the Consolidation Coal Company, and, as the charter party says, be "loaded by them," the agreed place of loading was, by implication, at its docks or piers, and the time required for loading must be justly and reasonably determined with reference to the usual facilities of that corporation in that respect. Scrutton, in continuing the topic of reasonable time (at page 244), says:

"It means reasonable under the circumstances then existing, other than self-imposed inabilities of either shipowner or charterer, and should be estimated with reference to the means and facilities then available at the port, the course of business at the port, and the character of the port with regard to tides and otherwise."

We illustrated this proposition practically in Randall v. Sprague, in our opinion passed down on May 1, 1896 (21 C. C. A. 334, 74 Fed. 247, 248), where we referred to charter parties providing generally for loading at Baltimore as follows:

"It is evident that the vessel was chargeable with notice that, by the usage of the port coal was not stored at Baltimore, but was to be loaded from the cars, so that the usual strict obligation to have the cargo on hand prior to commencing loading did not exist in all its particulars."

A similar qualification is referred to by the circuit court of appeals for the Seventh circuit in Corrigan v. Furnace Co., 41 C. C. A. 102, 100 Fed. 870, 882, where the court alluded to the fact that the parties were compelled to "rely for a supply of ore upon the operation of the mines, and its transportation by rail, over neither of which it had or could exercise control." It was also applied by a decision in the exchequer chamber, by judges of very high ability and experience, in Hudson v. Ede, L. R. 3 Q. B. 412, with reference to a cargo of grain, which, according to the usage, was loaded into ships from steam lighters which necessarily made a river voyage of 110 miles. These citations illustrate the character of the "means and facilities" referred to by Mr. Scrutton, and which are to be taken into consideration in the case at bar; but an examination of the facts and the authorities applicable to the peculiar provision in this charter party that the vessel was to be loaded by a particular corporation, brings the case down to somewhat closer propositions and a narrower line than if the agreement had been general to load at the port of Baltimore.

The Consolidation Coal Company owned coal mines, situated about 180 miles from Baltimore, producing from 3,000 tons to 5,500 tons per day, a part of which they customarily shipped by rail to Baltimore to be in part loaded aboard vessels for delivery to New England ports, in part sold to steamers in the harbor for their own use, and in part sold for local purposes. The rest of the output of the mines was customarily sent directly from them to other ports than Baltimore. The total output seems to have been from approximately 93,000 tons per calendar month as a minimum to approximately 141,000 tons as a maximum. The amount shipped to Baltimore ran from about 18,000 tons each month as a minimum to about 50,000 tons as a maximum. The total output of the mines in October, November, and December, 1899,—being the only months which concern us,—and the amounts shipped to Baltimore in each of those months, were relatively as follows: In October 135,069.11 tons and 50,558 tons, November 140,-933.08 tons and 37,190 tons, December 125,495.10 tons and 38,958 tons. There is nothing to show that for these three months the output of the mines of the Consolidation Coal Company, or its pro rata distribution to the port of Baltimore, was unusual, or afforded anything of which this vessel can complain.

The propositions we have already submitted, therefore, lead to the conclusion that the vessel must be held to have stipulated that reasonable diligence in loading was satisfied by a reasonable exercise of the usual facilities of the Consolidation Coal Company during the months we have named, and that there can be no just ground of complaint as to any lack on the part of the Consolidation Coal Company in availing itself of those facilities, according to what was usual, unless there was some disregard of the stipulation "loaded in turn," or unless the Consolidation Coal Company failed to load with reasonable diligence its coal as it arrived at the port. There is no evidence that it did so fail, and therefore we must conclude that the vessel not only stipulated to submit itself, with reference to being loaded, to the customary facilities of the Consolidation Coal Company at Baltimore, but that it received the benefit of those facilities, unless on account of the words "in turn." That the law justifies this conclusion, based on these facts, is the inevitable result of every just and reasonable construction which can be put on this charter party as applied to the circumstances of the case. This flows out of what we said in Randall v. Sprague, ubi supra, and of Corrigan v. Furnace Co., ubi supra.

Very few cases, if any, have arisen in the federal courts which bear directly on the facts before us. In the English courts there have been many decisions which bear on them, either closely or remotely; but it is not of much value to attempt to apply them, when it generally happens that there is some particular fact which distinguishes every demurrage suit from every other, so that the court, after all, is compelled to go back to the underlying rules, which easily solve the case before us. One late English case, however, is worthy of explanation, not only because it proceeds on the rules which govern us, although under different circumstances, but also because it considers the earlier cases in such way that it is not necessary for us to observe on them. We refer to Lyle Shipping Co. v. Corporation of Cardiff [1900] 2

Q. B. 638. It is true that that case related to a question of discharging a vessel where the cargo-owner is frequently relieved with reference to unloading by circumstances which would not relieve him as to loading. Notwithstanding this distinction, the case comes out precisely on the same principle as that at bar. It appeared that the vessel was to be "discharged with all reasonable dispatch, as customary." First of all, at page 643, Lord Justice A. L. Smith, very properly, we think, lays aside the words "as customary" on the ground that, if they were not in the charter party, they would be implied. Thus, notwithstanding these words, the charter party in the case cited and that at bar appear to conform; that is to say, in each case the cargo was to be handled with reasonable dispatch according to the custom of the place of loading or discharging. It appeared in the case cited that by the custom of the port of Cardiff the cargo was to be delivered into the wagons of certain specified railway companies, and in no other way; and that the cargo owners were not personally guilty of any negligence in discharging the cargo, but did their best to get the wagons customarily used; and they were held not liable for demurrage which arose from the fact that there was, owing to the stress of work at the port, a deficient number of wagons available. Now, if, in the case at bar, the charter had simply stipulated for loading the vessel at the port of Baltimore, without naming any particular person or corporation by whom she was to be loaded, the charterer might have been liable in any event for demurrage, because it would have been its duty, subject to the possible qualification stated by us in Randall v. Sprague, to have had the cargo ready for the vessel when her turn came; but, having stipulated that she was to be loaded by the Consolidation Coal Company, the charterer is brought exactly within the same obligation as to loading that the charterers were in Lyle Shipping Co. v. Corporation of Cardiff as to discharging. In the one case the stipulation as to the party by which the vessel was to be loaded limited the particular liability of the charterer with reference to loading, precisely as in the other the charterer's liability was limited in discharging by the usage giving the control thereof to a single railway company. In neither case could there be any liability so long as the customary and usual facilities of the corporation which was to load or the corporation which was to discharge were brought into full effect and operation; and the facts of the case at bar fail to show, as we have seen, and as it will further appear, that there was any deficiency in this particular. The observation of Lord Blackburn in Dahl v. Nelson, 6 App. Cas. 38, 44, is to the same effect, where, although under different circumstances, he says, in substance, that, when the dock for discharging a vessel is named by both parties, neither is at fault when, owing to the exigencies of traffic, the vessel is for some time refused admittance to the place of discharge.

The peculiarity of this charter party, in its reference to the Consolidation Coal Company, entirely distinguishes this case from Adams v. Packet Co., 5 C. B. (N. S.) 492, so much relied on by the vessel, where the strict rule is applied that, when a ship is to be loaded at a coal port named generally, the charterer cannot ordinarily excuse himself for not having a cargo in readiness. Indeed, that case was

expressly distinguished from Harris v. Dreesman, there cited, in which, as at bar, it was stipulated that the vessel should be loaded from a particular colliery.

We will return to some phases of this topic which we have discussed when we come to consider certain particular propositions made in behalf of the vessel with reference to the claim that there was a lack on the part of the Consolidation Coal Company from what was usual with regard to vessels to be loaded from that particular colliery; but we will now proceed to look at the effect of the expression "in turn." The learned judge who disposed of the case in the district court found that this stipulation had been violated in two particulars: By giving precedence, first, to two steamers belonging to the Consolidation Coal Company, and, second, to certain local demand for steamers for bunker consumption, for street railways, and perhaps other local purposes. On this branch of the case, we are met by an express stipulation in the charter party which is not to be lightly put aside. If it were intended that preferences of these kinds should be given, it was easy to so stipulate in the charter party, and it should have been done. It was apparently usual for the Consolidation Coal Company to give priorities of this character; but this does not relieve the position. On the other hand, the case illustrates in a striking manner what we have already said, that "where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent." The usages alleged are of such an indefinite character that they might permit the loading into the steamers of the Consolidation Coal Company, and the diversion for local uses of the entire output at Baltimore in any one month, or even for more than one month. From the very nature of the usage, no limit can be put on it; so that to refuse this vessel the full benefit of the expression "in turn" would expose her to an indefinite detention at the port of loading, without any rule by which the detention could be measured in advance, and without any relief. The authorities cited by one party or the other which are supposed to bear directly on this question are contradictory. None are of conclusive weight, and they are differently understood by different writers. Scrutton, Charter Parties (4th Ed.) 96, 97; Carv. Carr. at Sea (3d Ed.) 708, 709; Abb. Merchant Ships & Seamen (14th Ed.) 410, 411. In Evans v. Blair (C. C. A.) 114 Fed. 616, 620, we pointed out under what limitations some of the expressions in the cases thus cited may be safely applied. On the whole nothing would be gained by our undertaking to discuss them. What we have already said, however, is in the line of what was well observed by Martin, B., in Lawson v. Burness, 1 Hurl. & C. 396, 402. In that case it was claimed that the expression "regular turn" in a charter party was to be construed as subject to the custom of the colliery where the vessel was to be loaded, by virtue of which custom vessels were loaded in the order in which they were entered on the books of the colliery, and not in the order in which they reported. Martin, B., observed:

118 F.—2

"I cannot conceive anything more unreasonable than that, where two persons enter into a charter party by which a vessel is to load in regular turn, vessels which come in after it should load before it, because, by the practice of the colliery, vessels which are entered first in the book, though not ready to load, are loaded before those which are ready."

As well observed in Scrutton, Charter Parties (4th Ed.) 16, such usages "may control the mode of performance of a contract, but cannot change its intrinsic character"; and to submit this vessel, which had stipulated for a specific right as to the order of being loaded, to usages which leave her no definite rights whatsoever, would be a change of that class. We think the conclusions of the learned judge of the district court in reference thereto correct.

The district court allowed demurrage only so far as the vessel was detained by not receiving her turn, as we have explained. She, however, complains that, aside from this, the delay was unreasonable, so that she is entitled to additional demurrage. The facts bearing on her propositions in this respect are so doubtfully exhibited in the record that, if we should attempt to revise the conclusion of the district court in reference thereto, we would have no reasonable expectation of reaching any better result than that court accomplished.

There is a complaint that the charterer had not in force any contract with the Consolidation Coal Company which entitled it to a cargo; but we think the record shows clearly that there was a contract for sufficient coal to be loaded in turn, and to be loaded in turn was all that the vessel was entitled to. It is also complained that the charterer had dispatched to the Consolidation Coal Company an unreasonable number of vessels for loading, thus itself contributing towards obstructing reasonable expedition in loading. It is quite probable that, so far as this represents a proposition of law, it might, under some circumstances, lay a basis for a contention to the effect that the charterer had so accumulated vessels as to prevent reasonable dispatch. The facts, so far as we can ascertain them, do not sustain this complaint. All we can find in reference thereto is to the effect that the tonnage engaged by the charterer was larger than it had been earlier in the year. This signifies nothing, because this might have been expected for the autumnal months. The record shows only 10,300 tons under charter by it, which, in proportion to the traffic of the Consolidation Coal Company, cannot be presumed to be unusual. The vessel reported on November 4, 1899, and her lading was completed on December 15th, this covering 38 working days. The demurrage given her by the district court was for 11 days, leaving 27; so that the vessel, in order to maintain a claim of general lack of diligence, must show that this period of 27 days was unreasonable. There had reported ahead of her 30,200 tons, which, with her, made 32,600 tons to be loaded in 27 days. As we have seen, the coal shipped to Baltimore in November was 37,190 tons, and in December a little in excess of that, and this was not an unusual amount, either with reference to the maximum or the minimum shipments to Baltimore; so that the entire amount to be loaded, according to the usual facilities of the Consolidation Coal Company, for a period of 27 working days, could have been but very little, if any, in excess of 32,600

tons. There is a conflict of evidence as to the amount which the Consolidation Coal Company could load at Baltimore, but the only authoritative testimony is that about 2,000 tons per day was the maximum. The parties fail to show us exactly how much coal was diverted as representing the 11 days' demurrage allowed the vessel by the district court. If this had been stated, we would have had before us the finding of that court as to the reasonable amount of coal to be loaded each working day. On the whole, as the record stands, we can find no justification for revising the determination of the district court in any particular. As both parties have appealed, and neither has maintained its appeal, we can see no occasion for awarding costs to either. This was the rule in The North Star, 106 U. S. 17, 29, 1 Sup. Ct. 41, 27 L. Ed. 91, and, though departed from in McComb v. Frink, 149 U. S. 629, 644, 13 Sup. Ct. 993, 37 L. Ed. 876, we think it altogether the better practice, unless in exceptional cases.

On each appeal there will be a judgment as follows: The decree of the district court is affirmed, with interest, and without costs.

WEBB, J., sat at the hearing of these appeals, but resigned before they were decided.