ROSS et al. v. CARGO OF 3,408 TONS OF POCAHONTAS COAL et al.

CROWLEY et al. v. CARGO OF 3,639 TONS OF POCA-
HONTAS COAL et al.

(District Court, D. Maine. November 21, 1908.)

Nos. 10, 12.

1. SHIPPING (§ 171*)—DEMURRAGE—CONSTRUCTION OF BILL OF LADING.
   The provision of the new bill of lading that, after arrival and notice to the consignee and the expiration of 24 hours, the vessel shall have precedence in discharging over all vessels arriving or giving notice after her arrival, requires such vessel to be given her turn subject to whatever customs or necessities exist at the port of discharge and which may fairly be presumed to have been within the contemplation of the parties.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. § 171.*]

2. SHIPPING (§ 171*)—DEMURRAGE—DELAY IN DISCHARGING—RIGHT OF PRE-
   CEDENCE.
   Schooners which arrived at the port of Portland, Me., for discharge of coal cargoes under bills of lading providing that they should have precedence in discharging over all vessels arriving or giving notice after their arrival, and that for any violation of such provision they should be compensated in demurrage as if, while delayed by such violation, their discharge had proceeded at the rate of 300 tons per day each, must be held to have contracted with reference to the facilities for coal discharging at that port, and, among them, the facilities at the wharves of the railroad company to whose wharves they were assigned, and are not entitled to claim a violation of contract because steamers of regular transatlantic lines arriving after them were, in accordance with contracts and long custom, given precedence in discharging at the company's wharves which were not used as discharging places for coal but for general cargoes. They were, however, entitled to precedence, over after-arriving vessels carrying coal cargoes, to discharge at any wharf of the company used for discharging coal, so long as they were not assigned to any particular berth, and, after such assignment, to precedence over any after-arriving vessel at such berth.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 568; Dec. Dig. § 171.*
   Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

3. SHIPPING (§ 183*)—DEMURRAGE—DELAY IN DISCHARGING—CONSTRUCTION OF
   BILLS OF LADING.
   Where other vessels were given precedence in discharging over such schooners in violation of their bills of lading, they were entitled to be

compensated in demurrage only as if their discharge had proceeded at the rate of 300 tons per day, regardless of the number of vessels so given precedence which were discharging at the same time.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 593; Dec. Dig. § 183.*]

4. SHIPPING (§ 171*)—DEMURRAGE—CONSTRUCTION OF BILL OF LADING.
The fact that the railroad company to whose wharves the schooners were assigned, in order to secure a certain supply of coal for its own use had contracted with a particular coal company to give its vessels immediate discharge in consideration of the right to use a percentage of all coal so discharged, did not entitle such vessels to precedence in discharging without liability on the part of the consignees for violation of the contract, in the absence of any express provision therefor; and for the same reason vessels carrying cargoes of coal for the company's own use had no right of precedence in discharging, since the parties could not be presumed to have contracted with reference thereto.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 563; Dec. Dig. § 171.*]

In Admiralty.

Benjamin Thompson, for libelants.
Bird & Bradley, for claimants and respondents.

HALE, District Judge. These two causes in admiralty are heard together. The libel in the first case is brought by Alexander Ross in his own behalf, and as the agent for the owners of the schooner Helen W. Martin, against a cargo of 3,408 tons of Pocahontas coal, of which Samuel D. Warren and others were consignees, and are now claimants. This suit is to recover five thousand dollars ($5,000) for detention of the vessel at the port of Portland in April, 1903.

The second libel is by John G. Crowley, in his own behalf, and as agent for the owners of the schooner Van Allens Boughton, against cargo of 3,639 tons of Pocahontas coal, and also against Samuel D. Warren and others, as the charterers of the vessel and consignees of the cargo. This suit is to recover seven thousand one hundred and nineteen dollars and fifty-two cents ($7,119.52) for detention of the vessel at the port of Portland in March, 1903.

The testimony shows that on the 17th of February, 1903, the schooner Helen W. Martin was chartered by an oral charter, to load at Lambert's Point, Va., a cargo of coal, to be carried to the port of Portland at the agreed freight of $1.15 per ton and bridge money, cargo to be discharged free of expense to the schooner; that on March 7th the schooner received on board at Lambert's Point a cargo of 3,408 tons of Pocahontas coal, for which the master signed the usual bills of lading, by which he promised to deliver the cargo at the port of Portland, dangers of the sea excepted, to S. D. Warren & Co., they paying freight thereon, as agreed, together with all expenses of discharging. The bill of lading contained the provisions as to discharging of the "new bill of lading" or the "National Association bill of lading." All that is material of this bill of lading will be referred to later in this opinion. The Martin sailed on her voyage, arriving in Portland Sunday afternoon, March 15, 1903. Her master, Capt. Ross, came ashore

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

immediately, and went at once with his bill of lading to the office of the schooner's agent, Mr. Clark, of J. S. Winslow & Co., who immediately saw Mr. William M. Bradley, the agent and attorney of S. D. Warren & Co., the consignees named in the bills of lading. The schooner's agent informed Mr. Bradley that the Martin had arrived with coal consigned to S. D. Warren & Co., and that she had been reported to the Maine Central Railroad. Mr. Bradley requested Mr. Clark to report her at the Grand Trunk Railway. Mr. Clark took the Martin's bill of lading, went to the office of Mr. R. W. Scott, the Portland agent of the Grand Trunk Railway Company, and gave notice of the vessel's arrival. The vessel's arrival was also telephoned to Mr. Hammond, the agent of the Forest Paper Company, at Yarmouth, Me., the corporation for which the coal was intended. This corporation is a branch of the business of S. D. Warren & Co. Its mills lie near the Grand Trunk Railway at Yarmouth; and cargo can most conveniently be forwarded to it over the Grand Trunk Railway.

In January, 1903, the schooner Van Allens Boughton was chartered orally to load a cargo of coal at Lambert's Point, Va., to be carried to the port of Portland, at the agreed price of $1.15 per ton and bridge money; said cargo to be discharged free of expense to the vessel. Pursuant to the charter, this schooner received on board at Lambert's Point a cargo of 3,639 tons of Pocahontas coal, for which, on February 3d, the master signed the usual bills of lading, by which he agreed to deliver the cargo at the port of Portland, dangers of the sea only excepted, to S. D. Warren & Co., they paying the freight for the same, as agreed, together with all expense of discharging cargo. The bills of lading contained the same provisions as were in the bills of lading of the Martin, to which I shall call attention later in this opinion.

The Boughton proceeded on her voyage, and on February 13, 1903, at 9 o'clock in the forenoon, she came to anchor inside the breakwater at Portland Harbor. Capt. Carter, the master, immediately came ashore and went to the office of the schooner's agent, Mr. Clark, of J. S. Winslow & Co., who at once endeavored to find out by telephone to whom the Boughton should report. Upon communicating with S. D. Warren & Co., he was instructed to report the Boughton's arrival to the Maine Central. Capt. Carter then went to the office of the Maine Central Railroad Company, but found that the Maine Central would not accept the report. Capt. Carter then returned to the office of his agent, and, at Mr. Clark's suggestion, went to the office of Mr. Scott, the agent of the Grand Trunk Railway, at 12 o'clock, noon, and gave the clerk in Mr. Scott's office the bill of lading, requesting him to indorse upon it the Boughton's arrival. Capt. Carter then stated that he was there to report. The clerk declined to indorse the bill of lading, but made a note of the Boughton's arrival.

The evidence shows that at all times after their arrival and report, the two schooners of the libelants were ready to make delivery of their cargo, in accordance with the terms of their contract. The Martin arrived and reported, as I have already indicated, at 10 o'clock in the forenoon of Sunday, March 15th, and was reported to the Grand Trunk Railway, by direction of Mr. Bradley, at 1 o'clock the same afternoon. She was not assigned to any berth until April 7th, when she was di-

rected to proceed to Galt's Wharf, where she was docked on the same day. Her discharge began on April 8th, and was completed April 13th. Her cargo was shipped over the Grand Trunk Railway to the Forest Paper Company, Yarmouth. The corrected bill of lading shows that she had on board 3,403½ tons. Under the ordinary discharge of 150 tons a day, the consignee would have been entitled to 22 days, 16 hours, and 33 minutes in which to discharge her, excluding Sundays and holidays. She was therefore entitled to have her discharge completed at 11 o'clock a. m. on April 10th.

The Van Allens Boughton, as I have already said, arrived in Portland at 9 a. m., February 13, 1903, and at once reported to the consignees. By their direction she reported to the Maine Central Railroad at 11:10 the same forenoon, and to the Grand Trunk at 12 o'clock, noon. No berth was assigned to her until February 28th, when she was assigned to the coal pockets; on the day following, the assignment was countermanded; and on March 3, 1903, she was assigned to shed No. 6; the reason for the change in berths being the fact that discharging at the coal pockets would interfere with the Grand Trunk Railway getting its own supply of coal at the pockets. The Boughton was docked at shed No. 6 at 11 a. m. on March 3d; her discharge was completed at 12 o'clock, midnight, March 12th. The Boughton had on board 3,639 tons of coal. Under the ordinary rate of discharge she should have been discharged in 24 days, 6 hours, and 5 minutes, omitting Sundays and holidays. The time, therefore, would have expired on the 14th day of March, at 5:45 p. m.

It is contended on the part of the libelants that after the arrival at the port of Portland of the two schooners, and after their report to their consignees, various other vessels, both steamers and sailing vessels, with coal cargoes, arrived at the port of Portland and were discharged at the berths of the Grand Trunk Railway Company ahead of the Martin and Boughton; that thus the conditions of the bills of lading were violated by the consignees; that, during the time while other vessels were receiving precedence in their discharge, under the terms of their contracts, the Martin and Boughton were entitled to be compensated in demurrage as if their discharge had proceeded during the said time at the rate of 300 tons per day. Libelants claim that, under their contracts, the consignees could not exceed the number of lay days provided for, and, further, that their schooners must have precedence over subsequently arriving and reporting vessels, even though thereby their schooners are the sooner discharged. On the other hand, the claimants contend that, if any vessels did have precedence in discharging over these two schooners of the libelants, such precedence was given on account of the necessities of the Grand Trunk Railway Company and the customs existing at the discharging berths of that company; and that such necessities and such customs may fairly be held to be within the contemplation of the parties when the contracts were made.

I will further discuss in their order the details relating to the various contentions arising in the case.

1. The charter parties were oral; their terms are not fully proven. The bills of lading present the controlling evidence of the written con-

tracts before the court in relation to both vessels. Each of these bills of lading contained the provisions of the "new bill of lading" or the "National bill of lading." The only provision which is now material is the same in both bills of lading, and is as follows:

"And 24 hours after the arrival at the above named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every one hundred and fifty tons thereof; after which the cargo, consignee, or assignee, shall pay demurrage at the rate of six cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and pro rata for parts and portions of a day, beyond the days above specified, until the cargo is fully discharged; which freight and demurrage shall constitute a lien upon said cargo. After arrival and notice to the consignee as aforesaid, and the expiration of said 24 hours, said vessels shall have precedence in discharging over all vessels arriving or giving notice after her arrival; and for any violation of this provision she shall be compensated in demurrage as if while delayed by such violation her discharge had proceeded at the rate of three hundred tons per day."

This form of bill of lading has been before this court and has been commented upon by it in Carroll v. Holway, 158 Fed. 328, in which case I had occasion to draw the distinction between this contract and the old bill of lading, under which vessels were required to arrive at the wharf before the lay days began; while, under the new bill of lading, lay days begin 24 hours after arrival in port and reporting. In reference to this bill of lading, I referred to Choate v. Meredith, 1 Holmes, 500, Fed. Cas. No. 2,692, where Judge Shepley said:

"The new form of bill of lading seems to have been adopted to secure the shipowner against the delay consequent upon an obstruction of the consignee's wharf by other vessels or from other causes, and against his being compelled to await his turn to unload at the consignee's wharf. Under this form of bill of lading, if the consignee desires to exercise the right of requiring the master to unlade at the consignee's wharf, he must pay for the detention consequent upon that wharf's being inaccessible, if there are other suitable and convenient wharves accessible after the arrival of the vessel in port at which the vessel may be unladen."

Reed v. Weld (D. C.) 6 Fed. 304; Hall v. Eastwick, 1 Low. 456, Fed. Cas. No. 5,930; Manson v. Railroad (C. C.) 31 Fed. 297; Lake v. Hurd, 38 Conn. 536.

2. The claimants contend that the contract, as stated in the bills of lading with reference to precedence being given to other vessels, should be construed with reference to the customs and necessities which existed at the port of discharge, and which must have been within the contemplation of both parties. The bills of lading were identical in the two cases; and so I sometimes refer to them in this opinion as if they constituted one contract. The contest arises over the following provision in the bills of lading:

"After arrival and notice to the consignee as aforesaid, and the expiration of said 24 hours, said vessel shall have precedence in discharging over all vessels arriving or giving notice after her arrival; and for any violation of this provision she shall be compensated in demurrage as if while delayed by such violation her discharge had proceeded at the rate of three hundred tons per day."

It is claimed by the libelants that many vessels arriving and giving notice after the arrival and report of the Boughton and Martin were given precedence in discharging over these two schooners; and a list of the vessels so given preference is stated in an amendment to the libel. The libelants claim that, for the violation of this provision of their contract, they should be compensated in demurrage as if, while so delayed, their discharge had proceeded at the rate of 300 tons per day.

On the other hand, the claimants make the contention that no precedence was given, except such as was made necessary by the customs and necessities of the port of discharge. The learned proctor for the claimants divides the vessels, alleged by the libelants to have had precedence within the meaning of the bills of lading, into five classes, as follows:

"(1) Vessels arriving with and for cargo belonging to steamship lines with which the Grand Trunk Railway Company had contracted to receive inward and provide outward cargoes with berths for handling same.

"(2) Vessels arriving with coal cargoes belonging to a steamship line with which the Grand Trunk Railway had contracted to receive coal, and to provide for discharge thereof at a particular berth at once on arrival, upon condition that the railway company should have a portion thereof to relieve its necessities, and to enable it to continue in operation of its railway.

"(3) Vessels arriving with cargoes of coal belonging to the railway company and contracted for by it and necessary to it to enable it to continue in operation of its railway. (Some of the vessels of each of the above classes may also be equally entitled to be in another of said three classes.)

"(4) Vessels arriving with 'Commercial' or 'Industrial' coal, viz., schooner Brookline and steamer Mattawan in the first case, and the steamer Cardium in the second case.

"(5) Vessels arriving light for outward grain cargoes forwarded by the railway in the usual course of its business as forwarder of foreign freight, viz., steamers Headlands and Montauk in the first case, and steamer Yola in the second case."

The contracts between libelants and charterers were business agreements, and related to the carrying of coal cargoes. The testimony induces me to believe that, in entering into them, both parties alike must have known of the general facilities for the discharge of coal at the port of Portland, where their contract of charter was to be executed. Within reasonable limits, the charterers had the right to send the schooners to any terminal facilities in the harbor of Portland to discharge their cargoes. Whenever they selected the place of discharge, and designated the party to effect the discharge, they constituted such party their agent in the performance of that obligation.

The court in this circuit has, in several cases, had questions of this character under consideration. In Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, speaking for the Court of Appeals, Judge Putnam said:

"From the application of the well-known rule that where, in maritime contracts, parties have seen fit to choose fixed forms of expression, the great variety of contingencies incidental to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent. * * * Practically, therefore, this case comes down to the mere question whether or not the vessel was given her turn, subject to whatever customs or necessities existed at the port of discharge which might be fairly within the contemplation of both parties."

Judge Putnam further discussed the vessel's right to precedence or her "turn," and further said:

"Nevertheless, as we have already said, this did not give the Maine Central Railroad Company (the consignees) an arbitrary right, but only one which was just and reasonable. As well said by Lord Esher, the Master of the Rolls, in Carlton S. S. Co. v. Castle Mail Packets Co. (1897) 2 Q. B. 485, 490, although in a different connection, this is a power given to the charterers for business reasons."

All the cases in this circuit, and, in fact, all cases which have discussed similar questions, recognize and illustrate the difficulty which presents itself in construing a contract where the court has to decide what necessities, customs, and conditions the parties had in mind when they made the contract. Donnell v. Amoskeag Manufacturing Co., 118 Fed. 10, 55 C. C. A. 178; Stephens v. Macleod, 19 Ct. of Sessions Cases (4th Series) 38; Davis v. Wallace, 3 Cliff. 123, Fed. Cas. No. 3,657. In Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, in speaking for the Court of Appeals in this circuit, Judge Putnam has carefully reviewed all the late cases which bear upon this question. In Harding v. 4,698 Tons of Coal (C. C.) 147 Fed. 971, this court had before it a similar question. The court refused to read into the charter any limitations as to the custom of the port, on the ground that such custom was not shown to be within the contemplation of both parties when the contract was made. In that case, the court found that the exceptional conditions and particular circumstances which were invoked as a defense were not proven, and could not be held to have been within the minds of both parties in making the contract. After reviewing some of the cases upon this point, the court said:

"The business reasons suggested by Lord Esher and referred to in Evans v. Blair, supra, have led courts in recent decisions to modify what Judge Putnam has called the 'primitive rule'; but in Ardan Steamship Co., Ltd., v. Andrew Weir & Co., L. R. App. Cases 1905, 501, it will be seen that the House of Lords indicates a tendency of English courts to return to something like the 'primitive rule.' In the present attitude, however, of English and American law, it is difficult to determine in each case to what extent business reasons are competent matters of defense."

It is somewhat difficult in the matter now before the court to determine what customs and necessities at the port of discharge the parties had in mind when they made their contracts. I have given the claimants' statement and substantial admission as to the classes of vessels which actually had precedence in discharging over the two schooners of the libelants.

The question now before the court is whether any or all of the five classes of vessels which had precedence in discharging at the wharves of the consignees' agents were rightfully given such precedence on account of any custom or necessity existing at the port of discharge and within the contemplation of the parties when the contracts were made.

The situation in reference to the wharves and discharging facilities of the Grand Trunk Railway Company, as well as the methods and customs under which that company was carrying on business, are presumed to have been within the knowledge of S. D. Warren & Co.,

the charterers and consignees. Among the conditions existing at the Grand Trunk Railway at the time was the fact that the railway company regarded all of its wharves and discharging facilities as private; that the company was under contract to take coal from coal steamers; that for these reasons it would not guarantee berths for the discharge of any commercial coal; that it reserved the right to give preference to vessels with which it was under contractual obligations; and that at all of its wharves it gave precedence to steamers over sailing vessels, in discharging and loading. With these existing conditions, the charterers and consignees selected their place of discharge, as they had the right to do.

What, then, were the discharging facilities of the Grand Trunk Railway at the time in question? The proofs show that the Grand Trunk Railway owned 11 docks or discharging berths; that the principal dock for coal cargoes was known as the "Coal Pockets," situated near the Northern end of the Grand Trunk Railway bridge; that these pockets were so constructed that 1,500 tons of coal could readily be discharged per day, and indeed that 2,000 tons had actually been discharged there in 24 hours from vessels of the class of the Martin and Boughton. These pockets were built to handle the Dominion Coal Company's coal, and, under certain contractual relations between the coal company and the Grand Trunk Railway, the latter was to be furnished with a portion of all coal discharged from the coal company's steamers, in consideration of its prompt discharge and transportation of the balance of the coal to the customers of the coal company residing in Montreal and other places. During the time, however, to which the controversy relates, all classes of vessels and all classes of coal cargoes were discharged at the coal pockets, but in such a way as to interfere as little as possible with the discharge of the coal steamers.

The other berths of the Grand Trunk were sheds 1, 2, 3, 4, 5, 6, 7, 8, and Galt's Wharf. Of the berths last named, Galt's Wharf and shed No. 6 were the berths fitted up and used almost exclusively at the time in question for the discharge of coal. At Galt's Wharf the company had three sheer legs for the discharge of coal; and at that berth discharge could be made from three hatches at the same time. Shed No. 6, while ordinarily adapted for transatlantic freight, at the time in question had been fitted up with facilities for discharging coal which were fully as ample as those at Galt's Wharf.

The coal pockets, Galt's Wharf, and shed No. 6 were, therefore, the coal-discharging berths of the Grand Trunk at the time to which this controversy relates; but the evidence shows that coal was also discharged at some of the other berths and wheeled through the sheds, which were ordinarily adapted for the storage of transatlantic merchandise. In sending coal-laden vessels to be discharged at the Grand Trunk, the consignees must have had in mind that their vessels would probably be discharged at one of the three berths named which were in use at that time. In making a contract for discharging at the port of Portland, the libelants also must be held to have had in view the well-known facilities of the port at the time, and to have made their contracts with reference thereto. Among those facilities were the three discharging berths which I have enumerated, with such excep-

tions as the Grand Trunk might see fit to make at their other berths for business reasons, in order to facilitate the unlading of coal cargoes.

The other sheds to which I have referred by numbers 1, 2, 3, 4, 5, 7, and 8, were, as the evidence shows, built for the handling of general cargoes; they were not discharging berths for coal, but had been built and were operated for transatlantic traffic. During the winter of 1902–03, the Grand Trunk Railway had at their last-named berths seven lines of transatlantic steamers running to and from Portland. With these steamship lines the railway company had contracts to receive inward and provide outward cargoes with berths for handling these cargoes. In making the contracts now before me in the case at bar, the parties cannot be held to have had knowledge of any private contracts which the Grand Trunk Railway Company had with steamship lines; but they must be held to have had knowledge of the fact, which was open and obvious to any one acquainted with the shipping facilities of Portland, that these lines of steamers were running to the several wharves, which I have enumerated, of the Grand Trunk Railway Company. I must hold that the contract was made with this knowledge. Under the general business reasons to which Lord Esher referred, and which Judge Putnam evidently had in mind, the parties to these bills of lading must be held to have contracted, having in view the facilities for coal discharging at the port of Portland, and, among them, the facilities at the wharves of the Grand Trunk Railway. They must have known that the wharves, other than the three which I have enumerated, were not built or used at that time as discharging places for coal, but were built and used for general cargoes; and that their general use was then, and had been for a long time, in connection with the transatlantic steamship traffic.

I hold, then, that transatlantic steamers under contract with the Grand Trunk Railway Company, and all vessels with and for transatlantic cargo, and vessels with which the Grand Trunk Railway Company had contracted to receive inward and provide outward cargo, were entitled to precedence at the wharves where such cargoes were usually loaded and discharged, namely, at wharves 1 to 8, inclusive; and, therefore, that there was no violation by the consignees of their contracts of charter in consequence of the Grand Trunk Railway Company allowing such precedence. But this conclusion is subject to the following exception in reference to berth 6: At that berth, in my opinion, there could be no violation of the contract in cases where transatlantic steamers, arriving with general cargo, and, incidentally, with coal, discharged at the same time at which the transatlantic freight was being discharged or loaded. But in cases where transatlantic steamers with coal cargoes, either for the Grand Trunk Railway or for commercial people, arrived and reported at times subsequent to the arrival and report of the libelants' schooners, and were discharged at No. 6, or at any of the other transatlantic sheds, ahead of libelants' schooners, such vessels must be held to have been receiving a preference over the libelants' schooners, in violation of the bills of lading; for there is no pretense that coal cargoes had any connection with transatlantic freight. The Grand Trunk Railway Company was not obliged to change over its transatlantic facilities into coal-discharging

berths in order to accommodate coastwise or commercial people; but if, for its own convenience, or for other reasons, it did temporarily transfer or adapt its transatlantic facilities into coal-discharging facilities—as it did at No. 6—such berth, when so altered, for the time being at least, presented discharging facilities at which the libelants' schooners were entitled to be discharged, just as other vessels with similar cargoes were so entitled; and the same is true, if it shall appear that the same kind of discharge was made at any of the other transatlantic berths, namely, if it shall appear that such berths were actually used for discharging coal cargoes during any portion of the time when the libelants' vessels were waiting to discharge their cargo.

The Grand Trunk Railway Company, then, had a right, upon the arrival of the Boughton and Martin, to assign them to any safe berth at which they could most conveniently be discharged. It necessarily follows that, if the Grand Trunk Railway Company had so assigned these vessels, then, from the time of such assignment, only such subsequently arriving and reporting vessels as were discharged ahead of them, at the berth so assigned, could be said to have been given precedence. But no particular berths were assigned to the Boughton and Martin; although there was no reason, so far as the character of the vessels or their cargoes were concerned, why they should not have been discharged at one berth as well as another, except that the convenience and contractual relations of the Grand Trunk Railway Company were such that it was to its advantage to give precedence in the discharge of other vessels. In reference, then, to all vessels subsequently arriving and reporting, and which were discharged, at the three berths which I have enumerated—subject to the limitation as to No. 6—prior to the discharge of the libelants' schooners, it therefore follows that such vessels violated the provisions of the contracts with the libelants. Therefore, during the time while such precedence was given, the libelants are entitled to be compensated in demurrage as if the discharge of their schooners had proceeded during that time at the rate of 300 tons per day, and such precedence must be held to have continued until a berth was assigned to the schooners of the libelants; but, after such assignment was made, such precedence must be confined to vessels which arrived and reported later than the libelants' schooners, and which were in fact discharged at the particular dock or berth assigned to them.

The libelants claim that this 300 ton rate in the discharge of their vessels should apply to each of the vessels receiving such precedence, notwithstanding there may be several being so discharged at the same time. It is said that these are separate and distinct violations of the contracts, and therefore entitle the vessel so discriminated against to an additional 300 tons for each violation. The contracts provide that the libelants' schooners shall—

"have precedence in discharging over all vessels arriving or giving notice after her arrival; and for any violation of this provision she shall be compensated in demurrage as if while delayed by such violation her discharge had proceeded at the rate of 300 tons per day."

This provision of the contract was undoubtedly intended to prevent unjust discriminations in the discharge of vessels; but there is

nothing in the language of the contract which indicates any intention that the rate of discharge was to be increased with all the vessels that might be receiving precedence. In the event, then, that it shall appear that such precedence was in fact given, then the libelants' vessels will be entitled in any event to be compensated in demurrage only at 300 tons per day. For, in cases of this sort, the law does not favor penalties. All legal presumptions are to be taken in limitation, rather than an extension, of a penalty. In Continental Coal Co. v. Bowne, 115 Fed. 945, 946, 53 C. C. A. 427, 428, in speaking for the Court of Appeals for this circuit, Judge Putnam said:

"This clause is in the nature of a penalty, so that it ought not to be imposed unless the case comes clearly within the purpose which it intended to accomplish. That is the preventing of unjust discrimination."

While, as I have already held, the provision creating a penalty is applicable here to a certain extent, yet the enforcement of the penalty should not be carried further than the absolute reason of the case requires. Whether this particular aspect of the matter becomes material or not, can only be determined by the consideration of the matter by an assessor.

I have thus endeavored to dispose of all questions relating to the first class of vessels in claimants' enumeration; but I have not been able to follow claimants' enumeration with strictness, and have included in my finding vessels which will come under some of the other classes in the enumeration.

3. It is now the duty of the court to find whether any of the other classes of vessels enumerated by the claimants had precedence of the libelants' schooners; but in what I have to say in this opinion touching the other classes of vessels in the claimants' enumeration, it must be remembered that I have already covered some matters which strictly arise upon this point; so that, when I speak of the other classes of vessels in the enumeration, I do not intend to hold anything inconsistent with what I have distinctly held in the former part of my opinion.

(a) Under the second class, the claimant urges that certain vessels of the Dominion Coal Company properly had precedence of the schooners of the libelants, for the reason that the coal pockets were originally erected by the Grand Trunk Railway Company for the use of the steamers of the Dominion Coal Company; that, forced by the grave shortage of coal under which it was suffering, the railway company, in order to obtain even a percentage of the coal brought by the Dominion Coal Company to Portland, was compelled to contract with the Dominion Coal Company for the prompt and immediate docking and discharging of its steamers at the coal pockets. And the claimant urges that the docking of these vessels at the coal pockets was enforced upon the Grand Trunk Railway Company by the necessities under which it was laboring, in view of this contract with the Dominion Coal Company, and by the fact that, unless it did obtain coal in quantities adequate for the operation of its road, a reversal of the whole course of its business would have resulted.

I cannot hold that any sufficient reason is here given for allowing precedence to vessels of this class, unless they come within the rules

which I have already laid down. The shortage of coal under which this precedence was given was not one of the conditions which the parties to the bills of lading could have had in mind when they made their contracts. There is no more reason for allowing precedence to this class of vessels than there is for holding that strikes, frosts, or floods are within the business reasons which the courts have allowed to create an exception in cases of this sort. For in cases of strikes, floods, or frosts the courts hold that the charterers have the control in the matter, and can, if they choose, make special arrangements to meet special emergencies; and, if they do not choose to make these special arrangements in order that the chartered vessel may be unloaded within a time which may be reasonable under ordinary circumstances, it is only just that they should indemnify the shipowner for his loss. Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334; Wright v. New Zealand Shipping Co., 4 Ex. Div. 165; Randall v. Lynch, 2 Camp. 352.

In Niver v. Steamship Co., supra, the court said:

"A condition of affairs brought about by a contractor on the one part does not relieve him from his obligations to each of the contracting parties on the other part, acting severally, because the condition resulted in embarrassing all of them at the same time. To consent to any other rule would permit a contractor to relieve himself from his contracts in proportion to the number of parties he might involve in his own embarrassment by virtue of his own separate voluntary acts."

In the case from which I have just quoted, the court held that strikes were not the immediate cause of the difficulty. The court quotes the memorable language of Lord Bacon:

"It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore, it contenteth itself with the immediate cause, and judgeth of acts by that, without looking to any further degree."

I do not find anything which relieves the charterers and consignees from their contracts; for the evidence shows that, at the time in question, the pockets, as well as all the other discharging facilities of the Grand Trunk Railway Company, were discharging all classes of cargo directly upon cars; and that this was true not merely of coal belonging to the Grand Trunk Railway Company and Dominion Coal Company, but it was true also of commercial cargoes which at that time were arriving both by foreign steamers and by coastwise vessels; and that the Grand Trunk Railway Company, through Mr. Scott, its local agent, acted on the understanding that its wharves were private wharves, and, therefore, that the railway would not guarantee berths for the discharging of coal to commercial people, who, like S. D. Warren & Co., the consignees, were without any contractual relations, but that the railway compelled them to take their chances of finding a berth. The discharge of commercial cargoes was avowedly made by the Grand Trunk Railway Company in such a way as would cause it the least inconvenience and the least interruption to its business. And it does not appear that any regard was paid to the contracts under which the schooners of the libelants were carrying their cargoes. I must hold that the reasons which actuated the Grand Trunk Railway Company, and which they frankly admit, are no justification for the

violation of the contracts which existed between the libelants and the consignees of these two schooners.

(b) Claimants contend that there were vessels enumerated by them in the third class arriving with coal cargoes which had been ordered by the railway company, and which were vitally necessary for the operation of its road. Such vessels were necessarily docked wherever there were appropriate facilities for the discharge of cargo, the use of which the contractual relations of the Grand Trunk Railway Company with the transatlantic steamship companies did not forbid. The learned proctor for the claimants urges that to have caused this class of vessels to wait in the stream before discharging their much-needed coal would have resulted in a reversal of the business of the Grand Trunk Railway. The same reasons which I have just stated in reference to class 2 prevail, and are conclusive as to class 3. When the bills of lading were made, there was nothing to call the attention of the contracting parties to the facts that these conditions existed, or would exist in the future. The parties cannot be held to have contracted with reference to them. They were not physical and actual conditions apparent to shippers, as in the case of the discharging facilities at the port of discharge. If the charterers desired to be relieved of precedence for this class of vessels, they should have so stipulated in the contracts.

(c) The other classes of vessels which are claimed to have properly received precedence are cases where the agent of the Grand Trunk Railway, in acting as the agent of the consignees, to adopt the language of the learned proctor of the claimants, "used his best judgment as to the vessel that could be discharged without interference with its contract with the Dominion Coal Company." The evidence fails to present any reasons which justify the granting of precedence to any vessels other than those which are covered by the conclusions which I have stated. If the agent of the consignees used his judgment as to giving precedence in docking, such use of individual judgment can be no defense. If the consignees, or their agents, have given any precedence within the inhibition of the bills of lading, and within the conclusions to which I have arrived, then they have incurred the penalty of a double rate of discharge. All these matters are for the consideration of the assessor.

4. I find, then, that the consignees detained the two schooners, Helen W. Martin and Van Allens Boughton, in violation of their contract. I hold, therefore, that the libelants in each of these cases are entitled to recover. An interlocutory decree, therefore, may be entered for the libelants. An assessor may be appointed to report the damages sustained by the libelants in each case.