In re CARGO OF 3,408 TONS OF POCAHONTAS COAL. †

In re CARGO OF 3,639 TONS OF POCAHONTAS COAL.

(Circuit Court of Appeals, First Circuit. January 27, 1910.)

Nos. 819, 820.

SHIPPING (§ 172*) — DEMURRAGE — CONSTRUCTION OF BILLS OF LADING—SUBORDINATION TO USAGES AND NECESSITIES OF PORT.

The rights of schooners carrying cargoes of coal consigned generally to Portland, Me., under bills of lading of the new form providing that they should have precedence in discharging over all vessels arriving after them, explain with reference to whatever usages and necessities exist at that port, and with reference to the facilities there for discharging coal cargoes.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 569; Dec. Dig. § 172.*

Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeals from the District Court of the United States for the District of Maine.

Suits in admiralty by Alexander Ross, in behalf of himself and as agent of the owners of the schooner Helen W. Martin, against a cargo of 3,408 tons of Pocahontas coal, and by John G. Crowley, for himself and as agent for the owners of the schooner Van Allen's Boughton, against a cargo of 3,639 tons of Pocahontas coal; Samuel D. Warren & Co., claimants. Decrees for libelants, and claimants appeal. Reversed.

For opinion below, see 165 Fed. 722.

Edward F. McClennen (William M. Bradley and Brandeis, Dunbar & Nutter on the brief), for appellants.

Benjamin Thompson (Edward S. Dodge, on the brief), for appellees.

Before COLT, PUTNAM, and LOWELL, Circuit Judges.

PUTNAM, Circuit Judge. These appeals relate to two cargoes of coal shipped to Portland, Me., consigned to the appellants, S. D. Warren & Co. There are no further details as to the place of consignment. The cargoes are to be taken, therefore, as consigned generally to the port of Portland, in which port are all the places of discharge of coal by water named in this litigation, and other places. S. D. Warren &

Co. had no place of discharge owned by them or under their special control. The cargoes were intended for shipment by rail to their mills, a few miles in the interior, at Yarmouth, which were directly reached by the Grand Trunk Railway only. Therefore it was quite desirable that the coal should be discharged at some place fitted by the Grand Trunk Railway for receiving it, of which there were several where it was physically possible that it should be so received for shipment over its rails.

S. D. Warren & Co., through their agent, expressly directed one cargo to report to the Grand Trunk Railway. The other one was at first reported to the Maine Central Railroad Company, which refused to receive it; and afterwards it was received by the Grand Trunk Railway, although the record shows no express directions of S. D. Warren & Co. therefor. No question, however, seems to be raised, or could perhaps be raised, making any distinction between the two cargoes on this account. As to both of them, S. D. Warren & Co. apparently make the same claim, which we will take up later, that they had no control over the wharves of the Grand Trunk Railway.

The bills of lading are what are called "new form." They were considered by us in Evans v. Blair, 114 Fed. 616, 52 C. C. A. 396, decided on March 4, 1902. It is enough for the present to say generally of this class of bills of lading that they contain, first, an allowance of a specific number of lay days, with, second, a provision that, notwithstanding that allowance, the vessel shall have her turn; and this provision made to operate so that, even if the vessel is discharged within the lay days expressly allowed, but fails to have her turn, the consignee may be "penalized" to a certain extent. It is on the latter that the libelants rely.

Evans v. Blair has a broad outlook, and lays down certain principles on which S. D. Warren & Co. rely, and which are applicable generally to bills of lading which do not contain some specific provision to the contrary. By virtue thereof it was shown that it sometimes happens that, when the consignee has several places of discharge, the vessel may be compelled for reasonable business conditions to unload at one selected by him, although it would be possible to give her an earlier berth at another. In this connection, reference was made in Evans v. Blair to an observation by Lord Esher that the power given charterers to select a berth is for "business reasons"; and it was also pointed out that the option cannot be exercised arbitrarily. The foregoing are the leading principles of law to be applied to the facts in this case.

The special paragraph in question here is aside from the ordinary relations between vessels and their consignees; its purpose being as described in the opinion of the learned Judge of the District Court in these cases. Ross v. Cargo of 3,408 Tons of Pocahontas Coal, 165 Fed. 722. We said of it in Continental Coal Company v. Bowne, 115 Fed. 945, 946, 53 C. C. A. 427, 428, decided by us on April 24, 1902, as follows:

"This clause is in the nature of a penalty, so that it ought not to be imposed unless the case comes clearly within the purpose which it intended to accomplish. That is the preventing of unjust discrimination."

We were careful to guard this as we did. We did not declare the provision referred to as penal, but only "in the nature of a penalty," so that it "ought not to be imposed unless the case comes clearly within the purpose which it intended to accomplish." To illustrate this we thus said further that its purpose is "the preventing of unjust discrimination." We accept this as governing the application to be given the clause and as responding to our expressions in Evans v. Blair. As we go on, we may be compelled further to refer to some details of the opinions we have cited; but it is enough for the present to say that the learned judge of the District Court in the cases before us carefully and correctly explained the rules we thus developed. The facts were also fully and carefully stated by him. The difficulty arises, as often happens, in applying the facts to the law, and these appeals are not entirely clear with reference to the efforts to be made for that purpose.

A question has been suggested at our bar, and argued on the brief for the appellants, which might lie at the threshold of the entire cases for the vessels in question. The record does not show definitely the relations between S. D. Warren & Co. and the Grand Trunk Railway. Therefore, if the issue made at our bar by the appellants had arisen so as to require the attention of the court, serious difficulties would plainly be involved. Unless S. D. Warren & Co. had some control over the piers of the Grand Trunk Railway, there could ordinarily have been no discrimination on their part to which the bills of lading could have had any relation. The owners of the vessels maintain that there was discrimination of an unlawful character on the part of the railroad corporation. But apparently the provision in the bills of lading on which the vessels rely had no relation to the Grand Trunk Railway, unless the latter was subject to some arrangement previously made with S. D. Warren & Co. The law has always been held in the New England Atlantic states that the owner of a wharf has the same rights of controlling it as with regard to any other realty; and this is now declared to be the law generally in Louisville Railroad Company v. West Coast Company, 198 U. S. 483, 25 Sup. Ct. 745, 49 L. Ed. 1135. There it was also held that this rule was not affected even by the fact that, in that particular case, the wharf was of a public character so far as such a description could be given in relation to a wharf which had not been in fact dedicated to public uses.

Therefore, on the record, the Grand Trunk Railway may have been entirely out of any question here. If, moreover, the Grand Trunk Railway was not thus out of the case, no other wharf in the great harbor of Portland at which coal could have been discharged from these vessels would have been. Consequently it might follow that, on the question here of discharging in turn, the owners of vessels would be entitled to arraign S. D. Warren & Co. with reference to every wharf in Portland where these vessels could, as a matter of fact, have been discharged. This is a difficult proposition to be brought up against. Nevertheless we do not find that it is raised in the answers in these cases, or that it was considered by the learned judge of the District Court; and the owners of the vessels, neither at bar before us nor in their brief, have apparently felt themselves called

on to meet this issue. Consequently we do not perceive that we are so called on; and it is too important an issue to be disposed of, except on full consideration, after having been fairly brought to the attention of both parties in the trial court.

Passing by this, and coming to the cases as apparently understood in the District Court, we find that the owners of the vessels maintain that the Grand Trunk Railway had in all ten berths at various piers which they claim were possibly available for the schooners. The District Court eliminated all but three; and it was so clearly correct in its conclusions on this point that we need only refer to the opinion of its learned judge in reference thereto. These being eliminated, the first one to be noticed was Galt's Wharf, which furnished berths of such a miscellaneous and general character, including berths especially fitted for discharging coal from all classes of vessels, that, assuming, as we have shown we must assume, that the Grand Trunk Railway stood in the place of the consignees, the conclusion of the District Court that this landing place was within that portion of the bills of lading on which these cases turn is also so clearly correct that we need only again refer to its opinion in regard thereto.

We next consider Pier No. 6, which, with what is called the "Coal Pockets," made the remaining two. This pier, with other piers, Nos. 1 to 8, each inclusive, was fitted for the accommodation of large steamers, mostly transatlantic liners, used by them, not only for discharging cargoes, but for loading. Before disposing of this pier, we must turn again to the various qualifications with reference to the rights of cargo-carrying vessels of which we have spoken. In Donnell v. Amoskeag Company, 118 Fed. 10, 13, 14, 55 C. C. A. 178, we reiterated two rules of construction of maritime instruments: First, the ordinary rule that, as such instruments apply to a great variety of contingencies, incidental to navigation, which no one can precisely adjust, they for the most part receive a close literal construction; and the second rule, of an exceptional character, that under some circumstances bills of lading are compelled to bend in a liberal manner to certain settled usages, sometimes local and sometimes general, of which those relating to loading or discharging in turn are peculiar illustrations. The opinion of the District Court points out that the Grand Trunk Railway was compelled to yield to certain necessities for supplying itself with coal, arising from the extensive strike in force when the events before us occurred. Very likely this was true; but, as the learned judge held, this comes within the first rule we have explained, and the law is thoroughly settled that this contingency is one to which these bills of lading do not yield. With reference to that topic, the views of the District Court justly prevail, and its conclusions cannot be disturbed. This was explained to some extent in Randall v. Sprague (decided by us on May 1, 1896) 74 Fed. 247, 21 C. C. A. 334.

On the other hand, with reference to certain usages and methods of business which have so far prevailed that they occasionally control the letter of a maritime contract, we have shown their force in Evans v. Blair, 114 Fed. 616, 619, 52 C. C. A. 396, 399, et seq., already referred to. There the libel was in effect against the Maine Central Railroad Company with reference to a discharge of a cargo of coal, consigned

also to the port of Portland. The railroad corporation had three wharves for discharging coal at Portland, considerable distances apart. We observed in the opinion as follows:

"Therefore, in the present case, as the entire cargo belonged to the Maine Central Railroad Company, and was deliverable to it, and as the bill of lading failed to point out the specific wharf, or berth, at which it was to be discharged, the consignee had a privilege of selecting the place of discharge, and the vessel's right to precedence, or, what is the same thing, her turn, was subject thereto. Nevertheless, as we have already said, this did not give the Maine Central Railroad Company an arbitrary right, but only one which was just and reasonable. As well said by Lord Esher, the Master of the Rolls, in Carleton Steamship Company v. Castle Company, [1897] 2 Q. B. 485, 490, although in a different connection, this 'is a power given to the charterers for business reasons.'

"While the three vessels named in this case were each laden with bituminous coal, yet bituminous coal is of great varieties, and has so many different uses that the mere fact that they were all so laden does not of itself fix their right to a turn at a particular wharf other than if one was laden with coal, the second with flour, and the third with sugar. The limitations of the rule applicable to this case are very well shadowed out, on the one hand, in Stephens v. Macleod, already referred to, which is well summed up in Carver's Carriage by Sea (3d Ed.) 708, 709, and by the observations of Chief Justice Jervis in Leidemann v. Schultz, found in the work entitled, with a certain degree of liberality, Abbott's Merchant Ships and Seamen (14th Ed.) 411. In Stephens v. Macleod, the Cassia, which was the vessel in question, having arrived at the port of Portugalete, and being thus outside of the words 'as ordered,' was entitled to be berthed in turn. There being several wharves for loading iron ore, which was to be her cargo, and the case showing no particular reason to the contrary, she was held to have been entitled to be berthed at the first wharf which was open for her. On the other hand, in the case in which Chief Justice Jervis made the remark referred to, it appeared that the delay arose from the vessel being directed, at Newcastle, to load coke at a particular spout. It was contended for her owner that she could have been loaded earlier at another spout. To this Chief Justice Jervis answered: 'Yes, but with different coke and at a higher price. If the captain may choose at what spout he will load, he may next choose what articles he will load with.' So far as we can discover, there are no authorities of weight inconsistent with these expressions on the one hand and on the other. They practically illustrate the remark of Lord Esher, that the power given charterers to select a berth is for business reasons. They, therefore, further illustrate that, where several vessels are to load or discharge cargoes of the same generic class, they are apparently entitled, in their turn, to the first berths available, but that it may be shown that the particular circumstances are such as reasonably justify the consignee in directing otherwise."

We reviewed this topic, without any change in result, in Niver Coal Company v. Cheronea S. S. Co., in an opinion passed down on December 7, 1905 (142 Fed. 402, 406, 73 C. C. A. 502, 5 L. R. A. [N. S.] 126 et seq.). The various cases in point, including Evans v. Blair, were summarized in the ninth edition of Carver's Carriage by Sea (1909), at sections 460 and 620, with a result in no way different from that reached by us. As we have already said, the learned judge of the District Court has given full weight to all this; but he applied the facts with reference to Pier No. 6 and the "Coal Pockets" in a manner which we think is subject to modification.

It is enough for us to say that, by a maritime usage everywhere known and yielded to, piers and wharves provided for convenience in unloading and discharging "liners," with or without other large seagoing steamers requiring peculiar dispatch, must be, and are, lawfully

kept clear for vessels of those classes. If this could not be surely done, the result would be ruinous to such traffic.

It appears that the Dominion Company was the proprietor of one of the transatlantic lines which resorted to Pier No. 6; that, in the stress of an anthracite coal strike existing at the dates involved in this litigation, there was a great accumulation of bituminous coal-bearing vessels arriving at Portland, some of which were controlled by the Dominion Company; and that, consequently, an arrangement was made between the Dominion Company and the Grand Trunk Railway for a temporary provision by suitable staging, and so forth, for the discharge of its steamers arriving with coal. So it also appears that, in the emergency, one of the vessels involved in this litigation, practically at the close of the season of the Atlantic liners, was allowed to discharge at this pier; but certainly it cannot be said that there thus arose any fixed rule on which the vessels involved here could rely or make any claim. Consequently, we think that, notwithstanding anything that appears in the record to which our attention has been called, the Grand Trunk Railway, either in its own behalf or as representing S. D. Warren & Co., had and retained a right to exclude all vessels except those of the class for which the pier was primarily intended. This is rendered all the more emphatic because the vessels in question here did not receive any return cargoes at Portland, while the steamships for which the pier was primarily intended were to be reloaded in whole or in part from the rails of the Grand Trunk Railway extending to and upon the pier. Therefore we hold, with reference to both of the appeals before us, that the libelants in the District Court have no rights arising out of Pier No. 6, or from anything concerning it.

This leaves only the "Coal Pockets." These were constructed at a considerable distance from the nominal terminal of the Grand Trunk Railway, with proper sidings and piers for the purpose of accommodating the Dominion Coal Company's steamers. It is to be borne in mind that the Dominion Coal Company was an essentially different corporation from the Dominion Company. The Dominion Company was engaged in transatlantic commerce, while the Dominion Coal Company was engaged in mining coal in Nova Scotia, and transporting it from its mines to various points of consumption. Apparently the coal which it transported to Portland was mainly intended for export to Canada, although, in the stress of the anthracite coal strike, it appears that considerable portions of it were shipped to domestic points, among the rest Rumford Falls, in Maine. The several destinations of this coal, and the circumstances in regard thereto, however, are not very clearly shown. The libelants have not fully explained to us these facts, and we have been compelled to hunt for them through the record. We may, therefore, have made some mistakes from the point of view of the libelants. However, we feel confident that we have sufficient to enable us to work out with safety the results which we have reached, leaving to the District Court further investigations to enable it to complete results in regard to the "Coal Pockets" on the general lines which we point out.

S. D. Warren & Co. call our attention to the testimony of Blaiklock, who was superintendent of the Eastern Division of the Grand Trunk

Railway, which Eastern Division covers the "Coal Pockets." He testified that they were built "for the purpose of handling the Dominion Coal Company's coal and the Grand Trunk Railway Company's coal." He added:

"The vessels of the Dominion Coal Company were assigned to the 'Coal Pockets.' The vessels of the Dominion Steamship Company were to be discharged at No. 6 shed; the others were to take what was left."

Our attention has not been called to any evidence contradicting or qualifying that given by Blaiklock. Consequently the "Coal Pockets" may stand, so far as this matter is concerned, under the rules laid down in Evans v. Blair, in the same class as Pier No. 6. Nevertheless there is apparently some evidence in the record which has not been sifted for us, and which we cannot therefore weigh without too much labor, to the effect that vessels had been discharged at the "Coal Pockets" other than those of the class for which the "Pockets" were built. We understand, however, that the appellants claim that these were vessels of small capacity, as to which the Grand Trunk Railway could safely rely on their being discharged at intervals with such rapidity, and occupying so little time, as not to interfere with the Dominion Coal Company's vessels arriving and discharging in regular course. If the discharge of these incidental vessels was of the character we have described, there may be nothing here which would differentiate the "Coal Pockets" from Pier No. 6. As, however, these appeals must go back to the District Court, we are compelled to leave this branch for its further investigation and action.

In order that it may not be overlooked, we reiterate, what we have already stated, that the Grand Trunk Railway had no lawful right to give a preference out of the ordinary course of business at either of the discharging places in question here, merely on account of a necessity for fuel on the part of the railroad corporation, as was so held by the learned judge of the District Court.

The result is that, in determining the issues involved in the proceedings before us, no consideration is to be given to the facilities for discharging at Pier No. 6; and likewise none is to be given to the facilities at the "Coal Pockets," unless as the result of further investigation by the District Court. It follows that the cases must be remanded for further proceedings, and in each the following judgment is rendered:

The decree of the District Court is reversed, and the case is remanded to that court for further proceedings in accordance with the opinion of this court passed down on the 27th day of January, 1910; and the appellants recover their costs of appeal.