**PENDLETON BROS., Inc., v. NORTHERN COAL CO.**

**SCHREIBER v. SAME.**

District Court, D. Massachusetts. August 23, 1927.

Nos. 2470, 2514.

1. **Wharves ⬤⤳13—Owner, though engaged in business of common carrier, has same right to control wharf as he has respecting other realty.**

The owner of a wharf has the same rights of controlling it as he has respecting any other realty, and the fact that such an owner happens to be a common carrier and uses its wharf in its business does not affect this right.

2. **Shipping ⬤⤳47—Charterer obligated to provide a suitable place for discharge of vessels.**

Obligation to provide a suitable place to discharge cargo was on charterer, and it had the burden of arranging with the owner of wharf, which it designated as place of discharge, to accept and discharge chartered vessels.

3. **Shipping ⬤⤳171—Charter provision that vessel should "take turn in discharging" implies vessel's waiver of reasonably prompt discharge, and that charterer warrants vessel will receive "turn."**

Charter party providing that vessels should "take turn in discharging," standing alone, implies that vessel waives her right to discharge with reasonable promptness, and that charterer warrants that she shall receive the "turn" she agrees to take.

4. **Customs and usages ⬤⤳1, 13—"Custom" is general understanding on which persons trade in port, market, or commodity, and is unexpressed contract term.**

"Custom" means a general understanding on which all persons trade in a certain port, market, or commodity, and is an unexpressed term of the bargain.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Custom.]

5. **Customs and usages ⬤⤳10—No custom short of prescriptive right can restrict owner in using his own realty.**

No custom short of a prescriptive right can restrict an owner in using his own realty.

6. **Shipping ⬤⤳171—Extent to which railroad's exclusive use of its dock for handling its coal went beyond ordinary use held to determine charterer's demurrage liability.**

Where charter party provided that vessel should take her turn in discharging cargo of coal at dock owned by a railroad *held* that, to the extent that the dock and discharging apparatus thereon were ordinarily continuously in use for discharging railroad coal, they were to be deemed separate from part of the docks customarily used for commercial coal, for purpose of fixing charterer's liability on its warranty that vessel should have her "turn," and fact that because of railroad's necessities, due to strike, railroad was using entire dock for railroad coal, did not relieve charterer from demurrage liability resulting from the delay.

**7. Shipping ⊜171—In** assessing demurrage damages, the rate which parties intended to insert in charter party is taken as incorporated therein.

Where demurrage rate, which parties intended to insert in blank space provided therefor in charter party, was undisputed, charter party will be taken as incorporating such rate in assessing damages for demurrage.

In Admiralty. Libels in personam by Pendleton Bros., Inc., and by A. W. Schreiber, trustee for bondholders of the Bright Navigation Company, against the Northern Coal Company. Decree for libelants.

Albert T. Gould and Blodgett, Jones, Burnham & Bingham, all of Boston, Mass., for plaintiffs.

Frederick Foster, of Boston, Mass., for defendant.

MORTON, District Judge. These cases are libels in personam against the same defendant, which were heard together. The first suit is to recover demurrage, or damages for detention, on the schooner Dunham Wheeler under a written charter party, dated January 4, 1923, and signed by the respondent as charterer. The second suit is to recover similar demurrage or damages for the schooner Bright under a similar charter party dated December 30, 1922.

The essential facts are not in dispute and might well have been stipulated by the parties with a considerable saving of time. Each charter party was for carrying a cargo of coal from Norfolk to Boston, and each vessel was duly loaded, sailed from Norfolk, and arrived at the discharging port. There was a long delay in unloading them. The Wheeler arrived on January 19, 1923, and was not berthed for discharge till March 6th; the Bright also arrived on January 19th, a few hours after the Wheeler, and was not berthed for discharge until March 10th. The Wheeler's freight money amounted to $2,891, while the demurrage claimed for her amounts to $7,169.86. The Bright's freight money was $3,221.10, and her demurrage, as claimed, $9,448.56.

The present controversy arises on the demurrage provisions in the charter party. In the case of the Wheeler the charter was "for a voyage from Norfolk, Va., to Boston, Mass., Mystic Wharf." As to detention, the provisions were: "Vessel to be loaded as soon as coal is available. Vessel also to take turn at discharging at Mystic Wharf, Boston, Mass." —this clause being written into a printed form. In the case of the Bright, the charter read, "For the voyage from Hampton Roads, Va., to Boston (Mystic Wharf), Mass.," and the provisions as to detention (also written into a printed blank) were, "Vessel to take her turn in loading and discharging." The parties have treated the charters—I have no doubt correctly—as being in legal effect identical. "Mystic Wharf," referred to in them, is a coal-discharging dock owned and controlled by the Boston & Maine Railroad; it is recognized as a loading point from which interstate rates are established. At the time in question it had berths for four coal vessels, and eight discharging towers for coal, which could be moved from place to place along the wharf. Ordinarily the railroad used two or three of the towers on its own coal and the balance on "commercial" coal. At the time in question, however, there was a very serious condition as far as fuel was concerned on that railroad, perhaps on all railroads, caused by the impaired ability of the railroads throughout the country to transport commodities, due to the shopmen's strike and to the severe weather. Mr. Munster, purchasing agent of the Boston & Maine, testifies—and I see no reason to doubt his truthfulness—that at this period the railroad was having the greatest difficulty from day to day in getting coal to run its locomotives; that its receipts were not equal to the amount which it was using; and that it was depleting its reserve. Brennan, the foreman of the dock, had orders to unload railroad coal as fast as he could. These orders were entirely proper, and were not an unreasonable use of the dock.

The Boston & Maine water-borne coal came in steamers from Norfolk and from Great Britain. These were docked and discharged as soon as possible after arrival, regardless of other vessels. The entire dock was not, however, given over to railroad coal. One or two commercial vessels were in it most of the time; but the discharging towers, as I understand, were not used on the commercial coal, except when they could not be used to advantage on railroad coal. The result was very great delay in the discharge of commercial cargo at this wharf, a delay for which nobody here concerned was at all to blame. The railroad officials were doing the best they could in a serious emergency, and shippers and carriers of commercial coal, like the parties before me, found themselves caught in circumstances which were quite beyond their control. The question is: Who must bear the loss; whether it should fall on the vessels, or on the charterers?

[1] As stated by Judge Putnam in Re Cargo of Coal (C. C. A.) 175 F. 548, 550: "The law has always been held in the New

England Atlantic states that the owner of a wharf has the same rights of controlling it as with regard to any other realty, and this is now declared to be the law generally, in Louisville Railroad Company v. West Coast Company, 198 U. S. 483, 25 S. Ct. 745, 49 L. Ed. 1135." This being so, these charter parties amount to agreements between A. and B. which contemplate the use of C.'s property. If C.'s wharf be a purely private one he could, of course, refuse to allow it to be used at all, or could name the conditions under which use would be permitted. This right, as the above quotation shows, is not changed by the circumstance that C. is a common carrier and uses its wharf in its business.

[2, 3] The obligation to provide a suitable place for discharge was on the respondent. If it contracted with the vessels to go to Mystic Wharf, it had the burden of arranging with the owner of that wharf to accept and discharge them. The expression in the charter party "to take turn in discharging," standing alone, implies that the vessel waives her right to discharge with reasonable promptness, and on the other side the charterer warrants that she shall receive the "turn" which she agrees to take. Donnell v. Amoskeag Mfg. Co., 118 F. 10 (C. C. A. 1st); Harding v. Cargo of Coal (D. C.) 147 F. 971. In the cases cited the vessel was to be loaded in turn, or to "have" her turn in loading and discharging, while here they were to "take" their turn. No attempt has been made to distinguish those cases from the ones now before me on this ground. Counsel have assumed, I think rightly, that the meaning of the provision was the same in all.

Under such an agreement the extreme position for the vessel would be that no vessel arriving after her should be docked before her; while the extreme position for the other side would be that the vessel agreed to take whatever "turn" the dock-owner should accord her. This last view is obviously untenable in so far as it exposes the vessel to arbitrary or capricious treatment by the dock owner. Evans v. Blair (C. C. A.) 114 F. 616, 619. A good deal of evidence has been submitted as to "custom" or "usage," and discussions of the subject using those terms are to be found in other cases. Donnell v. Amoskeag Mfg. Co., supra; Harding v. Cargo of Coal, supra.

[4, 5] Nevertheless they seem to me rather inaccurate and unfortunate. Custom means a general understanding on which all persons trade in a certain port, market, or commodity—an unexpressed term of the bargain.

No custom, short of a prescriptive right, can restrict an owner in using his own realty. When A. and B. make a contract which calls for the use of C.'s property and to which he is not a party, both understand that it can be performed only as far as C. permits. In this case C. (the Boston & Maine Railroad) made a practice of unloading coal for other persons at its Mystic Wharf, and A. and B., contracting with this practice in mind, agreed that A.'s vessel should have her "turn" at C.'s wharf. Both parties must have understood that their agreement in no wise diminished C.'s right to use his dock as he pleased. At the same time, the charterer, which was ordering the vessels to Mystic Wharf for discharge, definitely warranted that they should receive their "turn" there.

Wharves where the business of discharging vessels belonging to other persons than the wharf owner is carried on are, of course, a necessary link in water-borne transportation. Questions similar to those in this case have several times been considered in this circuit. The meaning of the expression to "take turn" in loading and discharging has been carefully considered in Donnell v. Amoskeag Mfg. Co., 118 F. 10 (C. C. A. 1st), Harding v. Cargo of Coal (D. C.) 147 F. 971, In re Cargo of 3,408 Tons of Pocahontas Coal, 175 F. 548 (C. C. A. 1st) and Davis v. Garfield & Proctor Coal Co. (D. C.) 251 F. 743. In the two earlier cases the vessel was ordered by the charterer to a dock over which he had no control. The dock owner accorded a preference to other vessels, and it was held that the charterer was liable for the resulting delay. While custom and usage are discussed in some of these opinions and have been argued here, I am unable, as I have said, to see that they really enter into such cases; and the illustrations of custom which Judge Putnam puts in the Donnell Case, 118 F. at page 13, show, I think, the radical difference between custom or usage in the legal sense, and a dock owner's practice, which he may vary at any time.

The real question is the extent to which the charterer has warranted action by the dock owner favorable to the vessel, and this view, while not so stated in terms, is in effect recognized in the opinions in all the cases referred to. Both these Circuit Court of Appeals decisions hold, in substance, that on the facts before the court the charterer warranted that the vessel should be loaded or discharged absolutely in turn. It is a severe rule; but, as Judge Putnam observes, it is what the words of the contract mean, and "the great variety of contingencies incidental

to maritime transactions disenable the courts from establishing any safe theory by which the letter can be modified to meet any supposed intent." 118 F. 17.

It is argued for the respondent that In re Cargo of 3,408 Tons Pocahontas Coal, 175 F. 548 (C. C. A. 1st), and Davis v. Garfield & Proctor Coal Co. (D. C.) 251 F. 743, are inconsistent with this view. In the former case the opinion points out the practical necessity of the charterer designating the wharf for discharge (page 550), and holds that, having done so, he becomes responsible for the action of the wharfowner; i. e.; he warrants that it shall meet the provisions of the charter party. It decided that a general designation of the docks of a certain railroad company for discharge did not, in effect, allocate all those docks to the vessel, but only such portions of them as were ordinarily used by the railroad company for the class of cargo which the vessel was bringing. As to those, it was explicitly held "that the Grand Trunk Railway had no lawful right to give a preference out of the ordinary course of business at either of the discharging places in question here, merely on account of a necessity for fuel on the part of the railroad corporation." Putnam, J., at page 554. The legal theory on which this statement rests, in so far as it affects the Grand Trunk Railway, is not explained. It seems inconsistent with other expressions of the court above referred to and with the Louisville Ry. Case, supra. No decision has been referred to holding that a common carrier as dock owner stands on any different footing from other dock owners; and, if it were so, I should hesitate to say that the Boston & Maine's conduct in the circumstances here disclosed was such as to subject it to liability for unlawful discrimination or preferential treatment. If the Davis Case is inconsistent with the Circuit Court of Appeals decisions, it must yield to the authority of those cases.

Applying the law of these cases to the facts before me: There were at Mystic Wharf berths for four (or perhaps six) vessels to be discharged of coal, and eight discharging towers, most of which could be brought to bear on each berth. In ordinary times two or three of them would be sufficient for the railroad's needs; but at this time every tower which could be used for railroad coal was put on that work. When a vessel is ordered to a single dock, the Donnell Case holds that her strict turn there is warranted. When she is ordered to the docks of a designated person who has several

docks, at some of which he does not do commercial business, the order is taken to refer only to the commercial dock and the vessel is guaranteed her strict turn there. Here we have a single dock with several berths served by multiple discharging towers, some of which it was never the owner's practice to use on commercial cargoes, and where the owner's practice was to use on such cargoes only such portion of its discharging apparatus as was not needed for its own coal. Where the docks are separate, the commercial one stands like the single dock in the Donnell Case, and there is no practical difficulty in applying the charter party provisions to the facts. But where, as here, a large dock is treated as a unit, but part of it is always in use for the owner's business, the proper result is not so clear.

[6] All the present parties contracted on that understanding of the surrounding facts. It would be grossly unjust to award damages for detention on the theory that commercial coal and railroad coal stood on an equal footing at Mystic Wharf. All parties to these contracts knew that they did not, and never had stood so. To the extent to which Mystic Wharf and the discharging apparatus there were ordinarily continuously in use for railroad coal, they are, in my opinion, to be treated as the separate dock for that purpose of the Grand Trunk Railway was treated in Re Cargo of 3,408 Tons Pocahontas Coal, supra. The mere physical unity of the dock does not avoid the principle on which that decision rests. The evidence as to the precise extent of this use is not entirely clear. It is said to have been "two or three towers." It did not exceed the latter figure. For present purposes, the discharging capacity of the dock for commercial cargoes is to be considered as reduced by that amount. The libelants have no ground of complaint that later arrivals (having railroad coal) were discharged ahead of these vessels by the three railroad towers. Beyond that the vessels of the libelants were entitled to their strict turn at the rest of the dock, and the necessities of the railroad for fuel do not excuse the charterers under the warranty.

[7] There is no dispute but what both parties to the Dunham-Wheeler charter meant it to provide a demurrage rate of 8 cents per ton per day, like the charter of the Bright, and the failure to fill in the blank was a mere clerical error. This being so, the Wheeler charter party may, in assessing damages, be taken as incorporating the intended provision.

This result may require considerable com-

putation to state the damages correctly. If the parties are unable to agree, there must be a reference to an assessor for this purpose; but I hope that, with the data already at hand, the parties themselves will be able to agree upon the computation. If they do not stipulate the amount on or before September 15, 1927, a decree may be entered referring the matter to Julian Codman, Esq., as assessor.